638 F.2d 404
 7 Media L. Rep. 1360
 Steven A. PICO, by his next friend, Frances Pico, Jacqueline
Gold, by her next friend, Rona Gold, Russell Rieger, by his
next friend, Samuel Rieger, Glenn Yarris, by his next
friend, Richard Yarris, and Paul Sochinski, by his next
friend, Henry Sochinski, Plaintiffs-Appellants,
v.
BOARD OF EDUCATION, ISLAND TREES UNION FREE SCHOOL DISTRICT
NO. 26, Richard Ahrens, Frank Martin, Christina Fasulo,
Patrick Hughes, Richard Melchers, Richard Michaels, and
Louis Nessim, Defendants-Appellees.
 No. 619, Docket 79-7690.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 6, 1980.
Decided Oct. 2, 1980.
 
 1
 Alan H. Levine, Clark, Wulf, Levine & Peratis, New York City, Alan Azzara, Nassau County Chapter New York Civil Liberties Union, Mineola, N. Y., Arthur Eisenberg, Richard Emery, New York Civil Liberties Union, New York City, and Steven Hyman, Hyman & Miner, New York City, for plaintiffs-appellants.
 
 
 2
 George W. Lipp, Jr., Lipp & Rubin, Babylon, N. Y., for defendants-appellees.
 
 
 3
 Cahill, Gordon & Reindel, New York City (Floyd Abrams and Roy L. Regozin, New York City, of counsel), for National Council of Teachers of English, New York State English Council, Nat. Council for the Social Studies, and Speech Communication Ass'n as amici curiae.
 
 
 4
 Reuben & Proctor, Chicago, Ill. (William D. North, Chicago, Ill., of counsel), for American Library Ass'n and the New York Library Ass'n as amici curiae.
 
 
 5
 Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C. (Robert M. Weinberg, Gary L. Sasso and Michael H. Gottesman, Washington, D. C., of counsel), and David Rubin, Washington, D. C., for Nat. Ed. Ass'n as amicus curiae.
 
 
 6
 Irwin Karp, New York City, for The Authors League of America, Inc. as amicus curiae.
 
 
 7
 James R. Sandner, New York City (Elizabeth A. Truly, Jeffrey S. Karp, New York City, of counsel), for New York State United Teachers as amicus curiae.
 
 
 8
 Henry R. Kaufman, New York City (Ira M. Millstein, R. Bruce Rich, Amy L. Katz and Weil, Gotshal & Manges, New York City, of counsel), for Association of American Publishers, Inc., P.E.N. American Center, Writers Guild of America, East, Inc. and Writers in the Public Interest as amici curiae.
 
 
 9
 Nathan Z. Dershowitz and Edward Labaton, New York City (Victoria Eiger and Maureen Schild, New York City, of counsel), for American Jewish Congress, American Jewish Committee, Anti-Defamation League of B'nai Brith, American Orthopsychiatric Ass'n, Ethical Humanist Society of Long Island, Long Island Council of Churches, National Council of Jewish Women and the Unitarian Universalist Ass'n as amici curiae.
 
 
 10
 Ivan B. Gluckman, Reston, Va., for National Ass'n for Secondary School Principals as amicus curiae.
 
 
 11
 Before MANSFIELD and NEWMAN, Circuit Judges, and SIFTON, District Judge.*
 
 
 12
 SIFTON, District Judge.
 
 
 13
 This appeal arises from a judgment entered in the United States District Court for the Eastern District of New York granting defendants' application for summary judgment and dismissing plaintiffs' class action complaint which sought injunctive and declaratory relief with respect to alleged violations of the first amendment to the United States Constitution and Article 1, Section 8 of the New York State Constitution.[1] These violations were alleged in the complaint to have arisen as a result of defendant School Board's removal of three works of fiction, four autobiographies, two anthologies, and one work of non-fiction, from the school libraries and curriculum of the Island Trees Union Free School District on Long Island.[2] Since the majority of the panel concludes that defendants were not entitled to judgment as a matter of law, we reverse the judgment below. Because the majority is not in agreement as to whether the present record is sufficient to entitle plaintiffs to judgment in their favor, we remand for a trial to develop a plenary record on which that issue may be determined.
 
 FACTUAL BACKGROUND
 
 14
 On September 19, 20 and 21, 1975, three members of the Board of Education of the Island Trees Union Free School District[3] in Nassau County, including defendants Frank Martin, Patrick Hughes and the Board's President, defendant Richard Ahrens, attended a conference in Watkins Glen, New York, sponsored by an organization called People of New York United, an organization described by defendant Ahrens below as "a conservative organization ... composed of parents concerned about education legislation in this State." Attending the conference, besides the three defendants, were among others, according to Ahrens,
 
 
 15
 "... an attorney from Washington, D.C. who represented the Heritage Foundation, a conservatively oriented organization, George Archibald, a legislative assistant to Rep. John Conlon of Arizona, and other speakers with reputations in education circles who spoke about current topics about which the conservative community was concerned including litigation involving the control of text books and library books in the schools. The speaker on this topic was a Mr. Fike from Kanawa County, West Virginia which had undergone such litigation."
 
 
 16
 At the conference, according to Ahrens, defendants obtained "lists of books considered objectionable by some persons together with excerpts from them containing the more objectionable material." These "lists" consisted, at least in part, of two sets of crudely typed and reproduced sheets, one relating to a Randolph High School in Randolph, New York, the other, to an inspection in March of 1975 by an organization called Concerned Citizens and Taxpayers for Decent School Books of Baton Rouge, Louisiana of the card catalogue and shelves of the Tara High School library in an unidentified town in that State. The lists included titles, authors and quotations, with page references. Interspersed with the quotations, themselves presented with editorial underlining, were comments of which the following are a sample:
 
 
 17
 "Title: Soul on Ice by Eldridge Cleaver (Leader of Black panther (sic) and not allowed to live in America.)"
 
 
 18
 "THIS BOOK WAS RETAINED FOR SENIORS ONLY IN RANDOLPH. THE BOOK IS FULL OF ANTI-AMERICAN MATERIAL AND HATE FOR WHITE WOMEN. WHY WOULD TEACHERS WANT HIGH SCHOOL STUDENTS TO READ THIS???? OUR GROUP IS GOING TO FILE A COMPLAINT AGAINST THIS BOOK ON SEDITIOUS AND DISLOYAL MATTER."
 
 
 19
 "TITLE: Go Ask Alice by Anonymous. (Suppose to be diary of 15 year old girl)"
 
 
 20
 "NOTE: This book, after being reviewed by three teachers was retained. Parents, do not be fooled by the movie version of this book. It reads a lot different. If teachers cannot find a better book than this to illustrate drugs are bad then what are we paying them for. They justify their viewpoint because the girl dies in the end. A lot of teachers think this is a great book????????"
 
 
 21
 "(Handwritten) LEGISLATORS: KEEP MORATORIUM ON SEX ED! PROVIDE CRIMINAL PENALTIES SO D.A.'S CAN PROSECUTE VIOLATORS! PROTECT THE CHILDREN."
 
 
 22
 "1. Our Sexual Evolution by Helen Colton-This library book displayed in the Tara High School Library appears to be in violation of Act 500 of the Louisiana legislature. It belittles parents, presents no moral judgments, is anti-Christian and contrary to laws of God. It has chapters on Group Marriage, Communes, Abortion, Contraceptives etc. It also promotes women's lib. It costs $5.95 of our tax dollars."
 
 
 23
 "2. A Reader for Writers-A Critical Anthology of Prose Readings by Jerome W. Archer-This book was used in advanced composition class at Tara High School. It equates Malcolm X, considered by many to be a traitor to this country, with the founding fathers of our country."
 
 
 24
 The excerpts themselves, in contrast to the more politically oriented comments quoted above, are devoted principally to quotations of vulgar and indecent language referring to sexual and other bodily functions and crude descriptions of sexual behavior, although the manner of excerpting, including the use of underlining, elisions, apparent errors, and interspersed editorial comment leaves no great sense of confidence in the literal accuracy of the quotations. Several books appear on the list without any excerpts at all, but simply with a critical appraisal, e. g., A Reader for Writers. Another is listed without comment next to what purports to be quotations from three of the book's pages.[4]
 
 
 25
 Although acquired in September, nothing was done by defendants with these lists[5] until November 7, 1975, when defendants Martin and Ahrens attended "Winter School Night" at the District's senior high school. According to Ahrens and Martin, they asked a school custodian to let them into the school library and, by comparing Martin's lists of objectionable books with the library card index files, determined that nine "objectionable" texts were in the school library. The school's principal apparently interrupted their work. According to Ahrens, the two men "told him briefly what we were doing."
 
 
 26
 Nothing more was done about the matter thereafter until late February 1976[6] when, at a regular meeting of the Board, according to Ahrens,
 
 
 27
 "... we asked the two high school principals to stay after the meeting which they did. We had a lengthy discussion with them ... during which there was much concern and wringing of hands over the potential of the situation. One principal, after reading the excerpts said 'If this stuff is in the books they don't belong in the school.' We had not at that time checked the junior high school library so we asked that principal to check it (he did so and found two more books that were on Mr. Martin's list)."
 
 
 28
 As a result of this informal meeting, the Board directed the principals of the schools to remove the books from the library shelves forthwith.
 
 
 29
 Three days later the Superintendent of the School District,[7] Richard Morrow, sent a memorandum to the Board which had as its subject, "List of Books to be Banned." The memorandum stated, inter alia:
 
 
 30
 "My objection to direct action banning all the books on the list purchased (sic) at Watkins Glen is that we don't know who developed the list, nor the criteria they used. I don't believe we should accept and act on someone else's list, unless we first study the books ourselves.
 
 
 31
 "... (W)e already have a policy ... designed expressly to handle such problems. It calls for the Superintendent, upon receiving an objection to a book or books, to appoint a committee to study them and make recommendations. I feel it is a good policy-and it is Board policy-and that it should be followed in this instance. Furthermore, I think it can be followed quietly and in such a way as to reduce, perhaps avoid, the public furor which has always attended such issues in the past.
 
 
 32
 "... I have no doubt (but of course no proof) that such a local committee would end up agreeing about most of the books on the list. The Board's feelings on them are not so different from the staff's and parents'-after all, that is shown by the fact that the large majority of the books listed are not and apparently never have been recommended and used by the staff.
 
 
 33
 "... (U)nilateral banning by the Board, without inputs from the staff, would surely create a furious uproar-not only in the staff, but across the community, Long Island and the state. I don't believe you want such an uproar, and I certainly don't."
 
 
 34
 The Superintendent further reported that one of the books directed to be removed from the library, Malamud's The Fixer, was being used as part of a senior course in literature, having been "approved as part of that course in January, 1972, by the Board of Education."
 
 
 35
 Morrow's memorandum of February 27, 1976, was answered by a memorandum of March 3 from defendant Ahrens directing again that "all copies of the library books in question" (emphasis in the original) be removed immediately from the libraries.
 
 
 36
 Shortly thereafter, as Superintendent Morrow had predicted in his memorandum, the Board's action became known, and newspaper articles concerning the events began to appear in the New York press. Defendants responded to these articles by means of a press conference at which a release was distributed which read in part as follows:
 
 
 37
 "It comes as no surprise to this Board of Education that it is once again the subject of attack by Teacher Union leaders, headed by Walter Compare. With the election of School Board candidates just two months away, the Teachers' Union is once again attempting to discredit the Board and win the seats for two union-backed lackeys."
 
 
 38
 Referring to the Watkins Glen conference, the press release continued:"While at the conference, we learned of books found in schools throughout the country which were anti-American, anti-Christian, anti-Semetic (sic), and just plain filthy. Upon their return, Ahrens & Martin in early November went to the Senior High School Library to check the card catalog to see if any of these objectionable books were in our library. We discovered nine such books. We neither removed books, nor cards from the card file.
 
 
 39
 "At the next meeting of the Board, the entire Board discussed how to handle this situation, realizing that to make the titles of the books public might cause a sudden run on the library by the students.
 
 
 40
 "To date, what we have found is that the books do, in fact, contain material which is offensive to Christians, Jews, Blacks, and Americans in general. In addition, these books contain obscenities, blasphemies, brutality, and perversion beyond description.
 
 
 41
 "We are sure that when most of our teachers are given the opportunity to review the material, they will side with the Board, and against the Executive Committee of their own union. When most of the parents review these books, we are confident they will back us to the hilt, grateful that we have done our job and remained as they elected us ... their faithful Watchdogs."
 
 
 42
 Also during the month of March, the Board released an issue of its regular Newsletter to the residents of the School District stating, "(t)he entire contents of this special newsletter will be devoted to the library book issue" and asking the people of the District to attend the Board meeting of March 30, 1976, where "(y)ou will have the opportunity to examine the books yourselves." The Newsletter, after again attributing the newspaper stories concerning the issue to "lies and misinformation which has been spread by the teachers' union," stated:
 
 
 43
 "Mr. Compare is fighting to keep books in our schools which are offensive to Christians, Jews, Blacks, and all Americans in general. One such book (apparently referring to Vonnegut's Slaughterhouse Five) refers to Jesus Christ as a 'man with no connections.' One must ask oneself what motivates this man? ... Why ... does Mr. Compare insist that these books remain in the hands of our children."
 
 
 44
 In this atmosphere the Board held a public meeting on the subject on March 30, 1976. At this meeting Superintendent Morrow again stated his position in a prepared statement that it was "wrong for the Board-or any other single group-to act to remove books without prolonged prior consideration of the views of both the parents whose children read these books, and the teachers who use these books to instruct;" that it was "wrong to judge any book on the basis of brief excerpts from it (since m)any books-among them widely acclaimed classics-contain brief passages which, if taken out of context, would seem to condemn them;" that it was "wrong to take action based on a list prepared by someone outside the Island Trees community;" and that "it was wrong to by-pass the established procedure for reviewing the challenged books." Further, Morrow recommended that, pending review by a committee, "the challenged books be returned to the shelves, with the understanding that every parent has the right and the responsibility to supervise the materials his child reads." Instead, the Board ratified its earlier action removing the books, but directed that a committee of eight, composed of four school staff members and four parents, "read ... and make recommendations to the board" concerning "the educational suitability of these books and whether they are in good taste, appropriate and relevant." This latter language was taken from a provision of the union's contract with the Board which provided:
 
 
 45
 "Accordingly, it is agreed that teachers shall have the right to introduce and explore controversial material, provided only that the material and manner in which it is presented are in good taste, appropriate to grade level, and relevant to course content. Every effort will be made to present all sides of controversial issues."[8]
 
 
 46
 Coincidentally, the Board fixed May 26, 1976, as the date for the election of new Board members and directed that nominating petitions be filed by April 26, 1976.
 
 
 47
 On April 2, 1976, the Superintendent in a memorandum to the Board again urged that, pending review by the committee to be appointed, the books be returned to the library since the reason for their removal had been satisfied. The books were, however, not returned. On April 6, 1976, a book review committee was selected by the Board and the Superintendent. On April 30, 1976, the committee met, having apparently read some of the books.
 
 
 48
 "After a very comprehensive discussion regarding the book THE FIXER by Bernard Malamud, the vote to return the book to our modern literature curriculum was: 6 YES and 2 NO. It was further recommended that the book would be returned subject to parental approval."[9]
 
 
 49
 A second meeting of the committee on May 12, 1976, led to a memorandum from the committee to defendant Ahrens inquiring with respect to the two anthologies, Best Short Stories by Negro Writers and A Reader for Writers, "whether you object to specific stories or the entire book." There is nothing in the record to indicate whether this inquiry was ever answered and some indication that it was not. At this meeting the committee also voted unanimously that Oliver LaFarge's Laughing Boy be returned to the library and by a vote of 5 to 3 that Slaughterhouse Five be returned to a restricted shelf in the library. At meetings of May 26, June 16, and June 30, 1976, the committee voted to return Black Boy, Go Ask Alice, and Best Short Stories by Negro Writers to the shelves. It voted not to restore The Naked Ape, Down These Mean Streets, and Soul on Ice. The committee reported itself unable to make a recommendation with regard to A Reader for Writers since "(t)his book seems to be unavailable in this area."
 
 
 50
 Following the committee's report to the Board on July 1, 1976, the Board met again publicly on July 28, 1976, and took up what the minutes describe as the "Book Issue," voting separately on each of the books covered by the committee's recommendations. As a result of these separate votes, only Laughing Boy and Black Boy were returned to the library shelves generally. The other books at issue were directed to be "removed (sic) from elementary and secondary libraries, and for use in the curriculum."
 
 
 51
 At the same time as the book committee was considering each book, two of the incumbent members of the Board of Education ran again for office. According to defendant Ahrens, the "book banning issue was the major one in the campaign. Nevertheless (or more probably because of this) the incumbent members were re-elected."
 
 
 52
 A further press release defending the Board's position was issued by defendant Ahrens in August 1976. In January 1977 this lawsuit was filed. The Board responded to the lawsuit with a press release stressing the repellent and vulgar language present in the books. Counsel for defendants, in a procedure of questionable propriety,[10] mailed a questionnaire to 4,979 mailing addresses in the District asking whether the recipient was a parent of public school children and whether the recipient "supported" the Board's action in removing "the books in question." The results of this mailing, "done at our attorney's request due to the alleged class action nature of the suit," but reported in defendants' response to plaintiffs' motion for summary judgment, were 508 (or 59% of those responding) supporting the Board, 358 (or 41% of those responding) opposed.
 
 
 53
 Following denial of plaintiffs' motion to remand the case to state court, defendants moved for summary judgment dismissing plaintiffs' complaint. In support of their motion defendants set forth the history and documents referred to above. In addition, they alleged:
 
 
 54
 "Defendants Ahrens and Martin objected to the books for numerous reasons including the presence of profanities and obscenities, explicit sexual allusions, depictions of deviant sex, the glorification of sex and drugs, ungrammatical usage, and excerpts offensive to racial, religious or ethnic groups."
 
 
 55
 The two defendants identified the offending essay in A Reader for Writers, not as the essay which equated Malcolm X with the Founding Fathers, but rather, as Swift's "A Modest Proposal." Defendant Ahrens found the subject of that 18th Century satire on England's treatment of Ireland "irrelevant to the curriculum." Defendant Martin averred that he "felt it to be inappropriate"-apparently referring to the standard of appropriateness of grade level contained in the union contract. Plaintiffs sought depositions of defendants and then themselves cross-moved for summary judgment. On August 2, 1979, Judge Pratt, relying principally on the decision of this Court in President's Council, District 25 v. Community School Board # 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), granted the motion of defendants for summary judgment in their favor.
 
 DISCUSSION
 
 56
 * We start with an awareness that the application of the prohibitions of the First Amendment to secondary school education presents complexities not encountered in other areas of government activity. We are dealing with the care of children by a government concerned with the "well-being of its youth." F.C.C. v. Pacifica Foundation, 438 U.S. 726, 749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978), quoting Ginsberg v. New York, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968). Moreover, "a principal function of all elementary and secondary education is indoctrinative-whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community." James v. Board of Education, 461 F.2d 566, 573 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). Further, "(b)y and large, public education in our Nation is committed to the control of state and local authorities." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Finally, we must accommodate "our concern for the First Amendment rights of students with a cautious deference to the expertise of educational officials within the academic environment." Thomas v. Board of Education, 607 F.2d 1043, 1050 (2d Cir. 1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980).
 
 
 57
 At the same time, "First Amendment rights, applied in the light of the special characteristics of the school environment, are available to teachers and students." Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Moreover, "(t)he Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures-Boards of Education not excepted." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). As Justice Jackson also wrote in the same decision, "(p) robably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational school officials may compel youth to unite in embracing.... (T)he First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings." Id. at 641, 63 S.Ct. at 1186. With respect to the relative expertise of courts and educational officials, the same opinion reminds us, "we act in these matters not by the authority of our competence but by force of our commissions. We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed." Id. at 640, 63 S.Ct. at 1186.
 
 
 58
 It is, however, not only the unusual number of potentially conflicting values which compete for attention in matters relating to secondary education that makes these cases difficult. There is, in addition, the generally acknowledged proposition that "freedom of expression demands breathing room." James v. Board of Education, supra, 461 F.2d at 572. That conclusion, based on an awareness of the "chilling effect upon the exercise of vital First Amendment rights," Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967), of determinations, whether by school officials or by courts, which attempt with either excessive breadth or excessive precision to delimit the areas of protected and prohibited speech reminds us to proceed with caution to consider not just the general outlines, but the specific facts of the case before us.[11]
 
 
 59
 As Judge Kaufman noted in James v. Board of Education, supra, 461 F.2d at 575:
 
 
 60
 "It is characteristic of resolutions of first amendment cases, where the price of freedom of expression is so high and the horizons of conflict between countervailing interests seemingly infinite, that they do not yield simplistic formulas or handy scales for weighing competing values. 'The best one can hope for is to discern lines of analysis and advance formulations sufficient to bridge past decisions with new facts....' Eisner v. Stamford Board of Education, 440 F.2d 803, 804 n.1 (2d Cir. 1971)."
 
 
 61
 Such considerations are relevant not only to our approach to the facts of the case before us, but also to an appreciation of the significance of past precedents. In circumstances in which so many interests and public policies converge, relatively minor changes in the pattern of facts presented "often deprive precedents of reliability and cast us more than we would choose upon our own judgment." West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 640, 63 S.Ct. at 1186. "It is a frustrating process which does not admit of safe analytical harbors." Eisner v. Stamford Board of Education, 440 F.2d 803, 804-05 n.1 (2d Cir. 1971).[12]
 
 II
 
 62
 The presence of these conflicting considerations affects, initially, the definition of what constitutes a prima facie case. Powers to prescribe what may or may not be said and what may or may not be read-powers which are "denied to most public officials," Thomas v. Board of Education, supra, 607 F.2d at 1049 n.10-are accorded to school officials because they are the necessary prerequisites to the formation of a school curriculum and the necessary prerequisites to the stocking of a school library. "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, supra, 393 U.S. at 104, 89 S.Ct. at 270. As this Court has pointed out in Presidents Council v. Community School Board, supra, one cannot bring to court every decision by a school official involving the shelving or unshelving of a book in a school library without truly exposing the country to the danger which was the concern of the Supreme Court in Minersville School District v. Gobitis, 310 U.S. 586, 598, 60 S.Ct. 1010, 1014, 84 L.Ed. 1375 (1940), overruled, West Virginia State Board of Education, supra, that the federal courts will become "the school board for the country."
 
 
 63
 It is not simply the onerousness of the task of policing every decision involving the contents of course curriculum or a school library for First Amendment violations which led to dismissal of the complaint in cases such as President's Council. The need for policing in such circumstances is, generally speaking, not there. The authority and responsibilities of our public school officials in the area are, by and large, so well understood and well performed that, absent extraordinary circumstances, there is no uncertain or "chilling" effect attendant on a decision to teach one subject rather than another or to select one from among many book titles competing for limited space on the library shelf. Just as it is well understood that "education would be impossible if teachers were forbidden to sanction incorrect responses or substandard essays with failing grades," Thomas v. Board of Education, supra, 607 F.2d at 1049, so it is well understood that the school library offers a more restricted choice than the public library and that what is not taught in high school will be available in college. The everyday administration of a school's curriculum or a school library does not, either directly or indirectly, impinge on the free expression of ideas.
 
 
 64
 In these circumstances, bare allegations that books have been removed from the shelves of secondary school libraries by responsible officials do not make out a prima facie First Amendment violation, even if the books have a controversial reputation so that one available inference is that they were removed to prohibit the expression of the ideas they contain. Such activities, being part of "the daily operation of school systems" do not "directly and sharply implicate basic constitutional values." Epperson v. Arkansas, supra, 393 U.S. at 104, 89 S.Ct. at 270. On the contrary, the activity is on its face entirely consistent with the performance of the educational function conferred on school officials. Were it the case here, as in President's Council, that nothing more was at issue than the conflicting inferences to be drawn from the act of removal of a controversial text from the shelf of a high school library, we would affirm the decision of the district court because no prima facie case was established.
 
 
 65
 In this case, however, we are presented with more than the inferences to be drawn from the act of removing controversial texts from library shelves, and more than the clearly understood, routine and regular task of selecting titles for a school library. What we have instead is an unusual and irregular intervention in the school libraries' operations by persons not routinely concerned with such matters. Moreover, this intervention has occurred under circumstances, including the explanations for their actions given by the participants, which so far from clarifying the scope and intentions behind the official action, create instead grave questions concerning both subjects. In circumstances of such irregularity and ambiguity, a prima facie case is made out and intervention of a federal court is warranted because of the very infrequency with which it may be assumed such intervention will be necessary and because of the real threat that the school officials' irregular and ambiguous handling of the issue will, even despite the best intentions, create misunderstanding as to the scope of their activities which will serve to suppress freedom of expression.
 
 III
 
 66
 The cases, however, which have recognized a prima facie First Amendment violation in some irregular and apparently arbitrary intervention in the daily operation of secondary school affairs have at the same time recognized that, because of the complexity of the social policies at work in the secondary school context, defenses-short of clear and present danger-must be recognized to permit the school official to establish that the education of the young cannot be handled entirely by routine procedures and even that "an added increment of chilling effect", Thomas v. Board of Education, supra, 607 F.2d at 1051, may have to be tolerated to perform adequately the task of educating the young. Thus, speech which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker v. Des Moines, 393 U.S. at 513, 89 S.Ct. at 740. Justice Fortas' concern for "the rights of others" has found particularized recognition in this Circuit in the regulation of language to protect the psychological well being of the young, Trachtman v. Anker, 563 F.2d 512 at 517 (2d Cir. 1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), and "to promote standards of civility and decency among school children," Thomas v. Board of Education, supra, 607 F.2d at 1057 (Newman, J., concurring).
 
 
 67
 To be sure, the burden of demonstrating such defenses rests with the school officials and the burden is one of persuasion, not of pleading.
 
 
 68
 "As for the burden of proof, Tinker, as well as other federal cases establish that, if students choose to litigate, school authorities must demonstrate a reasonable basis for interference with student speech, and that courts will not rest content with officials' bare allegation that such a basis existed." Eisner v. Stamford Board of Education, supra, 440 F.2d at 810 (citations omitted).
 
 
 69
 Nor is the burden a light one.
 
 
 70
 "Any limitation on the exercise of constitutional rights can be justified only by a conclusion, based on reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially jeopardized...." James v. Board of Education, supra, 461 F.2d at 571.
 
 
 71
 Moreover, and of principal importance to the resolution of the issues presented by this case, the burden is not simply to demonstrate that there is a basis for the school officials' actions. As stated in this Circuit in Eisner v. Stamford Board of Education, supra, 440 F.2d at 806, while we are concerned, first, with whether the Board's policy (is) justified as included within one or more of the categories of exceptional cases" in which regulation of speech is permitted in the schools,
 
 
 72
 "(s)econd, is the policy as narrowly drawn as may reasonably be expected so as to advance the social interests that justify it or, to the contrary, does it unduly restrict protected speech, to an extent 'greater than is essential to the furtherance of' those interests? See United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). In light of Freedman (v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)), the latter question might usefully be addressed, alternatively, to the substantive and to the procedural aspects of the policy-that is, first to the criteria by which school officials are permitted to bar literature from the school and second to the means by which the bar is to be effected." Id.
 
 
 73
 The rationale for this concern with the manner in which the regulation is carried out is that summarized in Keyishian v. Board of Regents, supra, 385 U.S. at 603-04, 87 S.Ct. at 683-684:"We emphasize once again that '(p)recision of regulation must be the touchstone in an area so closely touching our most precious freedoms,' N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 ... 'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' Id. at 432, 433, 83 S.Ct., at 337-338. ... When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone....' Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. For '(t)he threat of sanctions may deter ... almost as potently as the actual application of sanctions.' N.A.A.C.P. v. Button, supra, 371 U.S. at 433, 83 S.Ct. at 338. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform ... what is being proscribed."
 
 
 74
 Whatever may be said in favor of the good intentions of the school officials in this case-and more will be said on that subject, infra-little may be said in support of their sensitivity or precision in dealing with the First Amendment issues in this case. On the substantive side, the criteria for removal suggested by the evidence suffer from excessive generality and overbreadth. Whatever definiteness there may be in a complaint that a book is "filthy," Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), there is certainly no precision, sufficient to provide the kind of reasonably clear guidance necessary for free and open debate, in the complaints that books are "anti-Christian" or "anti-American." See Keyishian v. Board of Regents, supra, 385 U.S. at 598-99, 87 S.Ct. at 681-682. The very nature of this broad brush approach must inevitably be to suggest that the school officials' concern is less to cleanse the libraries of all books containing material insulting to members of one or another religious group or which evidences an inaccurate view of the nation's history, than it is to express an official policy with regard to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians and teachers at their peril.
 
 
 75
 However, quite apart from the articulated criteria for selection of the books for removal, precision of regulation and sensitivity to First Amendment concerns are hardly established by the erratic, arbitrary and free-wheeling manner in which the defendant school officials proceeded in this case. The books were removed from school library shelves before any concerned school official had read them, solely on the basis of mimeographed quotations collected by anonymous readers whose editorial comments revealed political concerns reaching far beyond the education and well-being of the children of the Island Trees Union Free School District. Moreover, so far from seeking to insure that the "prejudices of the community" not infringe individual free speech and so far from recognizing "that the will of the transient majority can prove devastating to freedom of expression," James v. Board of Education, supra, 461 F.2d at 575, defendants conducted themselves, despite warnings by their school Superintendent, in a manner calculated to create public uproar. By drawing the "book issue" into the School Board election, a labor dispute, public meetings (at which "we are confident" that "most of the parents ... will back us to the hilt") and then into a district-wide plebiscite, they insured that the impression would be created that freedom of expression in the District would be determined in some substantial measure by the majority's will. Having proceeded in this fashion, defendants are hardly in a position to carry their burden of establishing that they have not, in pursuit of their functions, "unduly restricted protected speech to an extent greater than is essential" to the furtherance of the interests sought to be protected. Eisner v. Stamford Board of Education, supra, 440 F.2d at 806. On the contrary, the Board's erratic and free-wheeling procedures inevitably leave it a matter of guesswork for teachers, librarians and students in the District whether other efforts at self-expression on their part will be curtailed with equally little notice and equally little opportunity for defense, in the name of policies having equally little to do with the local concerns of the educational community, subject to the equally uncertain outcome of public debate. As this Court has said, the erratic, unfair and arbitrary administration of policy with regard to speech in schools is as much to be feared as the contents of the policy itself as a source of first amendment violations. Eisner v. Stamford Board of Education, supra, 440 F.2d at 809. We require greater "sensitivity to some of the teaching reflected in relevant constitutional doctrine and to the dangers lurking in improper and unconstitutional administration" than is demonstrated by the Board of Education in this case. Id. at 809-10. Not only must there be "narrow specificity" in the criteria applied, but there must be the use of "sensitive tools" in their application. Keyishian v. Board of Regents, supra, 385 U.S. at 603-04, 87 S.Ct. at 683-684.
 
 
 76
 Finally, even were defendants in a position to carry their burden of establishing that there was a substantial and material basis for their actions and that their actions were possessed of sufficient procedural regularity to give a better basis than guesswork as to how the Board of Education would act in the future with regard to similar issues, plaintiffs below should have, in all events, been offered an opportunity to persuade a finder of fact that the ostensible justifications for defendants' actions-be it indecency or ungrammatical usage, as one defendant suggested, or some other ground-were simply pretexts for the suppression of free speech. As was recognized in Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1970), government may not "seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." See FCC v. Pacifica Foundation, supra, 438 U.S. at 746, 98 S.Ct. at 3038.
 
 
 77
 Clearly, mere reference by a defendant to personal standards of taste or political philosophy as one factor in a decision involving first amendment values cannot, in and of itself, provide a basis for rationally inferring an intent to suppress the different views of others. Courts cannot prohibit and, indeed, should encourage, within limits, the thoughtful application of personal standards of taste and morality and of political belief in the performance of governmental functions. Where, however, as in this case, evidence that the decisions made were based on defendants' moral or political beliefs appears together with evidence of procedural and substantive irregularities sufficient to suggest an unwillingness on the part of school officials to subject their political and personal judgments to the same sort of scrutiny as that accorded other decisions relating to the education of their charges, an inference emerges that political views and personal taste are being asserted not in the interests of the children's well-being, but rather for the purpose of establishing those views as the correct and orthodox ones for all purposes in the particular community. What was said in Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), applies here:
 
 
 78
 "The historical background of the decision is one evidentiary source.... The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmakers' purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."
 
 
 79
 Among the procedural and other irregularities which warrant an inference that the welfare and education of the children of the Island Trees School District were not the true motivating concerns which led to the removal of the books from school libraries in that District are, in addition to those already mentioned: defendants' substantive confusion, not to say incoherence, as to the reasons the books were being removed from the libraries; the informal and dilatory manner in which the matter was pursued, including the lapse of three months from the time the presence of the offending books was discovered in the libraries until the principals of the schools were asked to take some action to prevent children from reading them, cf. Thomas v. Board of Education, supra, 607 F.2d at 1052 n.17 (delay of six days by school officials in acting on complaint); the ex post facto appointment of a committee to review the removal of the books, the determinations of which were then, without explanation, not followed by the Board; the strong opposition of professional personnel, including the District Superintendent, to the procedures used by the Board, cf. Thomas v. Board of Education, supra, 607 F.2d at 1051 (noting the origin of the complaint with the President of the Board of Education, rather than with school administrative officials); and, finally, the "substantive" irregularities, as Arlington Heights puts it, of removing works by such generally recognized authors as Swift, the late Richard Wright, and Bernard Malamud, whose book, The Fixer, was, indeed, an assigned high school reading text.
 
 
 80
 In summary, the writer concludes that plaintiffs made out a prima facie case of a first amendment violation and that defendants failed to carry their burden of establishing that the manner, if not the motive for their actions, did not violate the First Amendment.[13] In addition, the writer is of the view that, even had defendants' case in support of their actions been more compelling, plaintiffs were improperly deprived of an opportunity to persuade the finder of fact that the proffered justifications were mere pretext for an intentional violation of plaintiffs' rights. While neither the right of free expression nor the free-wheeling style of the Board of Education in the Island Trees Union Free School District may seem, from all perspectives, of great significance, as Justice Jackson said with characteristic conciseness in the seminal case in this area, West Virginia v. Barnette, supra, 319 U.S. at 638, 63 S.Ct. at 1185 (1943):
 
 
 81
 "There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond the reach of the Constitution."
 
 
 82
 Since the majority is of the view that defendants were not entitled to judgment below and that plaintiffs are entitled to proceed with the prosecution of their claims, we reverse and remand to the district court for trial.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 83
 I dissent. The majority unjustifiably overrules our sound decision in the indistinguishable case of President's Council District 25 v. Community School Board No. 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), wherein we held that removal by school authorities from a school library of a book containing vulgarities and indecent matter on the ground that the book was educationally inappropriate for school children did not infringe any First Amendment rights.
 
 
 84
 In my view the majority's action represents an unwarranted interference with the rational exercise by the Board of Education of the Island Trees Union Free School District (the Board) of its statutory duty to prescribe appropriate materials for the education of the children in the district. Despite undisputed evidence that all but one of the eight books discontinued by the Board in this case contained indecent matter, vulgarities, profanities, explicit sexual descriptions or allusions, sexual perversion, or disparaging remarks about Blacks, Jews or Christ, and despite the freedom of the school's faculty and students to discuss in or out of school the ideas contained in the discontinued books, the majority would find a violation of the First Amendment based on possible violation of some vague, undefined rights of expression or on possible suppression of ideas on the part of secondary school children attending the school. Absent some evidence that speech or ideas by anyone are likely to be suppressed I believe this court should keep its hands off. The effect of the majority's decision is improperly to substitute a court's view of what student curriculum is appropriate for that of the Board.
 
 
 85
 The majority takes some liberties with the record, substituting suspicions for undisputed evidence. In the first place the best evidence of whether the eight discontinued books are unsuitable for the education of secondary school children is the text of the books themselves rather than the conclusory editorial comments of third parties which Judge Sifton cites while studiously avoiding quotation of the actual text objected to by the Board as indecent and improper. Accordingly, adopting the Supreme Court's practice in similar cases, see e. g. Federal Communications Commission v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), I have set forth in the margin those portions of the text of the books which led the Board to investigate their suitability as educational tools and to discontinue eight of the books.[1] Despite Judge Sifton's conclusion that the excerpts leave "no great sense of confidence in the literary accuracy of the quotations," I find, upon reading the books, that except for minor errors the quotations are indeed accurate. I also note that some of the books contain additional indecent statements not found in the original excerpts.
 
 
 86
 The suggestion by Judge Sifton that the Board was engaged in "an unusual and irregular intervention" into the operation of the school's library by persons not "concerned with their contents" flies in the face of the uncontroverted facts and the Board's duties under New York law. Under N.Y. Education Law § 1709 a local school board such as the Board here has both the power and duty to prescribe the books to be used in its schools.[2] There is also no support for statements by Judge Sifton that the Board acted arbitrarily, impulsively, confusingly, incoherently, erratically, dilatorily or in a "free-swinging" manner. This was no bookburning or banning on the part of zealous intermeddlers. Nor was its action in disregard of the rights and views of others. On the contrary, the Board acted carefully, conscientiously and responsibly after according due process to all parties concerned.
 
 
 87
 The Board's first step was not to remove the books permanently, as the majority suggests, but to transfer them to the School's Residence Reference Room for review by the Board. The decision to do this was not made until February 26, 1976, after all members had seen the objectionable excerpts and some had read at least a few of the books. The actual transfer within the confines of the school occurred on March 3, 1976 after the President of the Board (Ahrens), implementing the Board's decision, requested the school's Superintendent Richard G. Morrow to have the books taken "to the Board's office at the rear of the Residents Reference Room in Stokes for review by the Board," (emphasis supplied). In view of the excerpts (quoted in Footnote 1, supra), the impressions gained by members who had read some of the books, and the need for all seven members of the Board to read all of the books in order to form their judgments (every one of the limited number of copies would obviously be needed for the purpose), the transfer of the books was eminently sensible. The Board's appointment of an eight-person advisory committee to read the books and make recommendations and the Board's later vote continuing two of the ten books as part of the curriculum demonstrate that the March 3rd action was far from final.
 
 
 88
 That the Board did not prejudge the educational suitability of the books is attested to by its decision not to take any action until it had the views of others, including a cross-section of the school staff and the community. On March 30, 1976, it held a public meeting at which its seven members voted unanimously to appoint an eight-person committee comprised of four members of the school staff and four parents to review and make recommendations regarding the educational suitability of the books and whether they were in good taste, appropriate for the age and grade level, and relevant.[3] In early April it appointed the Committee. The four community members consisted of a recently graduated student attending college, a former PTA president, a former Board president and a mailman; the four staff members were an English teacher, a social studies teacher, a high school principal and an elementary school principal. The appointment of the Committee had been recommended and was approved by the School Superintendent, Richard G. Morrow.
 
 
 89
 During the weeks that followed the eight Committee members read all but one of the 10 books under consideration,[4] held a series of meetings, and on July 1, 1976, submitted its report to the Board. Its recommendations were as follows: (1) that The Fixer be "returned to the Modern Literature curriculum, subject to parental approval"; (2) that four others, Laughing Boy, Black Boy, Go Ask Alice and Best Short Stories by Negro Writers, be "retained" (i. e. kept in the library); (3) that two books, The Naked Ape and Down These Mean Streets, be "removed from the library" and (4) Slaughter-house Five be "put on a restricted shelf." Except for three books on which the 8-person Committee's vote was unanimous, its votes were divided, ranging from 7-1 to 5-3. With respect to two books, Soul on Ice and A Hero Ain't Nothing but a Sandwich, the Committee could not agree, four voting in each case for retention and four for removal. The Committee was unable to make a recommendation with respect to the tenth book, A Reader for Writers because not all members had read it.
 
 
 90
 On July 28, 1976, the seven-person Board, having had a chance to review the books again in light of the Committee's recommendations, made its decision with respect to each of the 10 books under consideration. The Board decided: (1) unanimously to retain Laughing Boy, (2) by a 6-1 vote to retain Black Boy on a restricted basis, (3) by a unanimous vote to discontinue Slaughterhouse Five, The Naked Ape, Down These Mean Streets, Soul on Ice, Best Short Stories by Negro Writers and A Reader for Writers, from use in the School's curriculum, (4) by a 6-1 vote to remove Go Ask Alice from use in the curriculum, one member voting to retain it on a restricted basis, (5) by a 5-2 vote to remove A Hero Ain't Nothing But a Sandwich from use in the curriculum, 2 members (including Martin) voting to retain it on a restricted basis, (6) by a 5-3 vote to remove The Fixer from use in the curriculum, 2 members (including Martin) voting to retain it on a restricted basis and 1 member to retain it with no restrictions.
 
 
 91
 The retention of two of the ten books by the Board and its divided vote with respect to three is in my view wholly inconsistent with a claim that the Board acted erratically, arbitrarily, or in a "free-swinging style." Since the Board could not delegate its statutory duty and the Committee's recommendations were advisory only, the Board was entitled to differ from the Committee's recommendations, provided a rational basis existed for its doing so. Five members of the Board later attested to such a basis when they swore,
 
 
 92
 "2. That we have read each of the books reviewed by the committee referred to in the affidavits of Mr. Martin and Mr. Ahrens.
 
 
 93
 3. That we each thoroughly considered the recommendations of such committee, the opinions of the superintendent of schools and of members of the community before casting our respective votes with respect to these books (Exhibit 'A-15').
 
 
 94
 4. That our reasons for casting votes to remove or restrict certain volumes were that they contained obscenities, were irrelevant to our curriculum, were inappropriate and were in bad taste. They contained foul language, gross sexual allusions and language that just wasn't necessary to the story line. Our votes were, however, split on certain works as a result of varying degrees of concern about the relevancy, educational applicability and degree of bad taste exhibited.
 
 
 95
 5. That we feel we represented the basic values of the community in our actions and that we have exercised our duties in an intelligent, thoughtful and reasonable manner."
 
 
 96
 Similar, more detailed affidavits and depositions were furnished by Richard Ahrens, President of the Board and Frank Martin, Vice-President (who, after reading the books, voted in favor of retention of some which other members voted to remove from the curriculum). Specific reasons have been given by each for his action with respect to each book. Martin voted to place on the restricted list books in which vulgarity appeared reasonably necessary to the story line but to remove those that indulged in vulgarity, deviant behavior and explicit sex scenes solely for their own sake. Mr. Ahrens objected to the degrading treatment of blacks and the vulgarity in Soul on Ice, the poor grammar in A Hero Ain't Nothing But a Sandwich, glorification of sex and drugs in Go Ask Alice, the explicitness of sex in The Naked Ape, which violated the Board's policy against teaching sex education, the vulgarities and anti-Semitism in The Fixer and the sadism of Slaughterhouse Five.
 
 DISCUSSION
 
 97
 The general principles governing judicial intervention into secondary school education for the purpose of protecting First Amendment rights of students and teachers are fairly well settled. Students do not surrender all of their individual rights by submitting to the public educational process. Their speech and free exchange of ideas will be protected as long as they do not interfere with, obstruct or disrupt the functioning of the teaching system, including the choice of curriculum and methods prescribed by those vested with the duty of providing them with a formal education. For instance, a student may not be punished for refusing to salute the American flag, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), or wearing an armband in symbolic opposition to Viet Nam hostilities, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Nor may he be barred from off-campus printing and distribution of an indecent publication, Thomas v. Board of Education, 607 F.2d 1043 (2nd Cir. 1979). Similarly, an instructor may not be disciplined or barred from teaching because he symbolically expresses his personal political views by wearing a black armband in class, James v. Board of Education, 461 F.2d 566 (2nd Cir.), cert. denied 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), because he is labelled a "subversive," Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), or because he or she refuses to salute the flag, Russo v. Central School District No. 1, 469 F.2d 623 (2nd Cir. 1972).
 
 
 98
 On the other hand, the process of public education, if it is to succeed, mandates that "school officials must have some latitude within the school in punishing and prohibiting ordinarily protected speech both out of regard for fellow students who constitute a captive audience, and in recognition of the fact that the school has a substantial educational interest in avoiding the impression that it has authorized a specific expression," Thomas, supra, 607 F.2d at 1049. "School authorities can regulate indecent language because its circulation on school grounds undermines their responsibility to try to promote standards of decency and civility among school children," Id. 1057 (Newman, J., concurring).
 
 
 99
 Public secondary school education can function effectively only if school boards are accorded rather broad discretionary authority to determine the subjects to be taught, the curriculum deemed most suitable, the methods of teaching to be employed, and the disciplines to be followed by teachers and students within the school, including the educational tools to be used, whether those tools be test tubes in the laboratory or books in the library. If each student were free to insist that the curriculum, including library books, be changed or augmented to suit his ideas or those of his parents, chaos would ensue. The result would be no different than if a student were permitted to speak out in class whenever he wished or to refrain from studying prescribed subjects that were unappealing to him. Such conduct does not fall within protected First Amendment rights. Tinker, supra, 607 F.2d at 1049.
 
 
 100
 For these reasons the Supreme Court emphasized in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) that
 
 
 101
 "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."
 
 
 102
 As the Court had warned in Abington School Dist. v. Schempp, 374 U.S. 203, 300-301, 83 S.Ct. 1560, 1612-1613, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring):
 
 
 103
 "We should heed Mr. Justice Jackson's caveat that any attempt by this Court to announce curricular standards would be 'to decree a uniform, rigid and, if we are consistent, an unchanging standard for countless school boards representing and serving highly localized groups which not only differ from each other but which themselves from time to time change attitudes.' " Illinois ex rel. McCollum v. Board of Education, supra, (333 U.S. 203) at 237, 68 S.Ct. 461 at 477, 92 L.Ed. 649.
 
 
 104
 Recognizing the deference that must be paid to school authorities in such matters, the Court in Epperson, supra, established as a standard that we may not intervene in decisions of school systems unless they "directly and sharply implicate basic constitutional values," 393 U.S. at 104, 89 S.Ct. at 270 (emphasis supplied). This test clearly requires, as a condition precedent to judicial intervention, a showing that the school's action (1) violates the students' right of expression and (2) is not reasonably related or necessary to the performance by the school of its educational function. A school board's decision as to curriculum, moreover, may properly reflect local community views and values as to educational content and analysis, James v. Board of Education, 461 F.2d 566, 573 (2nd Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972):
 
 
 105
 "The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom. Although the pros and cons of progressive education are debated heatedly, a principal function of all elementary and secondary education is indoctrinative-whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community. '(S)ome measure of public regulation is inherent in the very provision of public education.' Note, Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1053 (1968). Accordingly, courts consistently have affirmed that curriculum controls belong to the political process and local school authorities." (Emphasis supplied)
 
 
 106
 This inherent function of school administration was relied on by the Seventh Circuit in its recent opinion in Zykan v. Warsaw Community School Corp., 631 F.2d 1300 (1980), which held that actions similar to those involved in this case (including the removal of Go Ask Alice from the library) simply did not rise to the level of constitutional violations. The court said, it is "permissible and appropriate for local boards to make educational decisions based upon their personal social, political and moral views." At 1305.
 
 
 107
 Recognizing these principles, this circuit upheld a school board's prohibition or regulation of the use on school property of expressions and subject matter that would be fully protected outside the school premises. In President's Council, District 25 v. Community School Board, No. 25, 457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), for instance, we upheld the right of a community school board to remove from all junior high school libraries one of the books that was discontinued by the Board here, Down These Mean Streets by Piri Thomas.[5] In holding that the board's removal of the book did not impinge on any basic constitutional rights, we stated:
 
 
 108
 "Since we are dealing not with the collection of a public book store but with the library of a public junior high school, evidently some authorized person or body has to make a determination as to what the library collection will be. It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent. The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions. If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school. Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here. See Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1051-54 (1968).... Here, patently we have no religious establishment or free exercise question, and neither do we have the banning of the teaching of any theory or doctrine. The problems of the youth in the ghetto, crime, drugs and violence have not been placed off limits by the Board. A book has been removed but the librarian has not been penalized, and the teacher is still free to discuss the Barrio and its problems in the classroom. ... The intrusion of the Board here upon any first amendment constitutional right of any category of plaintiffs is not only not 'sharp' or 'direct', it is minuscule." 457 F.2d at 292.
 
 
 109
 In East Hartford Education Association et al. v. Board of Education, 562 F.2d 838, 857 (2nd Cir. 1977) (en banc), we upheld a school board's right to enforce a dress code requirement for teachers, stating:
 
 
 110
 "Federal courts must refrain, in most instances, from interfering with the decision of school authorities. Even though decisions may appear foolish or unwise, a federal court may not overturn them unless the standard set forth in Epperson is met. The Supreme Court recently emphasized this point in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), in which a high school's summary disciplinary proceedings were challenged on due process grounds:
 
 
 111
 It is not the role of the federal courts to set aside decisions of schools administrators which the court may view as lacking a basis in wisdom or compassion.... The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees."
 
 
 112
 Id. 420 U.S. at 326, 95 S.Ct. at 1003 (citations omitted).
 
 
 113
 Similarly in Eisner v. Stamford Board of Education, 440 F.2d 803 (2nd Cir. 1971) we recognized that school authorities may adopt a policy prohibiting distribution of literature on school property without prior permission from the school administration and in Trachtman v. Anker, 563 F.2d 512 (2nd Cir. 1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978) we upheld school officials' refusal to allow distribution within the school of a sexually explicit questionnaire prepared by a student group.
 
 
 114
 Prohibiting exposure of children to indecent language has been upheld by the Supreme Court not only on school premises but in other locations as well, even where the unique demands of the educational process did not play a part. In Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), for instance, the Court held that the State of New York could constitutionally prohibit the sale to minors under 17 years of sex magazines that would not be obscene for adults, based on the state's interest in protecting the children's welfare and safeguarding them from abuses. And in Federal Communications Commission v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court upheld the FCC's authority to impose administrative sanctions on broadcasting of indecent language. In his plurality opinion Justice Stevens based the decision not only on the ground that the ideas expressed in indecent language could have been conveyed by less offensive language but also on the ground that the government had a proper interest in protecting minors from exposure to indecencies. 438 U.S. at 749-50, 98 S.Ct. at 3040, 3041. As we said in Thomas, supra, 607 F.2d at 1057 (Newman, J., concurring),
 
 
 115
 "When, as in this case, the audience at which a publication is specifically directed consists solely of high school students, and distribution is demanded at a school building attended by students down to the age of 11, First Amendment protection is not available for language that is indisputably indecent. If the F.C.C. can act to keep indecent language off the afternoon airwaves, a school can act to keep indecent language from circulating on high school grounds."
 
 
 116
 Application of the foregoing principles mandates an affirmance of the Board's action in the present case. Whatever may be a judge's personal view as to the wisdom of its decision, the Board acted on rational and specific grounds relevant to the education and welfare of the school children within its jurisdiction, and it did so fairly and conscientiously. It discontinued the handful of books because all but one contain either vulgar and indecent language, profanities, explicit sex, sexual perversion, poor grammar, glorification of sex and drugs, or antiJewish, anti-Black, or anti-Christian remarks.[6] In the Board's view the books lacked sufficient redeeming value to outweigh the threatened harm from the objectionable portions.
 
 
 117
 The Board's action does not hinder or destroy anybody's rights of free expression. The Board did not seek to inculcate students with any particular social or political views (e. g., legalized abortion or anti-abortion, adherence to the views of any political party or religion, promotion of the Equal Rights Amendment or the like). No free exchange of ideas was suppressed. No one was imposing views, whether labelled "orthodox" or otherwise, on anybody else. No one has been or will be disciplined as a result of the removal of the books. Nor will anyone be denied an education in line with basic community values.[7] Both parties agree that teachers and students are free to discuss and comment on the themes and ideas of the books in class or on school premises.[8] Students may also be able to purchase the books outside of school or borrow them from a public library. In short there are no First Amendment or other constitutional interests at stake, because, as the Seventh Circuit said in Zykan:
 
 
 118
 "the rule (is) that complaints filed by secondary school students to contest the educational decisions of local authorities are sometimes cognizable but generally must cross a relatively high threshold before entering upon the field of a constitutional claim suitable for federal court litigation. Such a balance of legal interests means that panels such as the Warsaw School Board will be permitted to make even ill advised and imprudent decisions without the risk of judicial interference. Nothing in these principles suggests that the courts should condone short-sighted board decision-making. But nothing in the Constitution permits the courts to interfere with local educational discretion until local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." At 1306.
 
 
 119
 Here we do not find any effort by school authorities to suppress speech or ideas on the part of teachers or pupils or to force them to "speak" against their will, such as existed in Tinker, Epperson, West Virginia State Board of Education, Keyishian, James, Thomas and Eisner, supra, or any ban on teaching or expressing certain views essential to a basic education, such as occurred in Epperson, supra (theory of evolution) and Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922) (statute prohibiting teaching of any foreign language to grades lower than the eighth). The handful of books discontinued by the Board leaves on the school's shelves hundreds of volumes for the students' edification and learning. The action therefore does not create any "pall of orthodoxy" or impermissible indoctrination such as might exist if exchange of ideas between teachers and pupils were prohibited. The ideas expressed in the removed books may also be freely discussed, in or out of the classroom, without using the profanities, vulgarities, and indecencies objected to by the Board. As Justice Stevens stated in FCC v. Pacifica Foundation, supra, 438 U.S. at 743, n.18, 98 S.Ct. at 3037: "A requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication. There are few, if any, thoughts that cannot be expressed by the use of less offensive language."
 
 
 120
 For these reasons, I find no constitutional infringement of individual rights of anyone in the removal of a handful of books containing indecent expressions. As Judge Mulligan pointed out in President's Council, supra, 457 F.2d 293:
 
 
 121
 "There is here no problem of freedom of speech or the expression of opinions on the part of parents, teachers, students or librarians. As we have pointed out, the discussion of the book or the problems which it encompasses or the ideas it espouses have not been prohibited by the Board's action in removing the book."
 
 
 122
 The same may be said of the present case. There is no legally significant distinction between this case and President's Council, supra, where we held that the removal from the school library by school authorities of a book containing vulgar language and explicit sexual allusions did not sharply and directly infringe upon freedom of speech and thought within the meaning of Epperson. That holding represents the law of this Circuit, by which we are bound. The suggestion that President's Council may be distinguished on the ground that in the present case eight of the school's hundreds of books were withdrawn (2 of the original 10 were continued) instead of the one in that case is unpersuasive, absent some evidence of inhibition of free expression within the school, of which there is none. Even assuming a First Amendment interest in gaining general access to the information in instructional material, the loss here is de minimis.
 
 
 123
 Nor has President's Council been weakened in any way by the Supreme Court's later decision in Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which upheld the right to receive information as the "reciprocal right of the speaker." Here no speaker exists claiming a constitutional right to address the students with respect to the text of the removed books unless it is the teachers, who are not prevented from speaking on the subject matter. The publishers and authors of the books do not claim any constitutional right mandating use of their books in the school. The only persons having the right to choose the books are the members of the Board, who have made their decision on rational grounds. Since under Virginia State Board the right of students to receive information is no greater than that of the speaker to furnish it, the decision has no application to the facts of this case.
 
 
 124
 The reasons advanced by Judges Sifton and Newman for not following President's Council are curious, vague and unsupported by the record. At one point Judge Sifton states (p. 414) that the Board's discontinuance of the eight books was impermissible as "an unusual and irregular intervention in the school libraries' operations by persons not routinely concerned with their contents." The simple answer is that § 1709 of the New York Education Law expressly imposes a duty on the Board to be concerned with the books to be used by school children within its jurisdiction,-indeed, to prescribe those books. At another point (p. 414) he suggests that the Board's action was ambiguous, overbroad, or indefinite, and that a board may not act without an adequate definition of the "scope" of its action. But here the action was specific, being limited to 8 books, and the scope of and reasons for the action have been clearly explained. The Board acted because of the patently indecent matter in almost all of the books, quoted above in Footnote 1. It is difficult to conceive of a more specific description of the scope and basis of the action at issue. At still another point (p. 415) it is suggested that the book removal was improperly motivated, expressing "an official policy with regard to God and country of uncertain and indefinite content," whatever this means. But the undisputed evidence of the motivation for the Board's action was the perfectly permissible ground that the books were indecent, in bad taste, and unsuitable for educational purposes. If by "official policy" Judge Sifton means an expression of community values, we have recognized this as a valid ground for action by school authorities. James v. Board of Education, supra, 461 F.2d at 573; see also, Zykan, supra, 631 F.2d at 1305.
 
 
 125
 In an apparent shift of tactics Judge Sifton next concedes (p. 416) that "(c) ourts cannot prohibit and, indeed, should encourage, within limits, the thoughtful application (by school authorities) of personal standards of taste and morality and of political belief in the performance of governmental functions" but that the action here must nevertheless be condemned because of procedural irregularity, stating that the Board acted in an "erratic, arbitrary and free-wheeling manner" which lacked "precision of regulation" (p. 415). The record here is wholly to the contrary. From the outset the Board made clear that its investigation into the educational suitability of the books was prompted by the excerpts of indecent matter quoted in Footnote 1. The initial transfer of the books from the school library to the Board Room was solely for the purpose of review to determine whether the books should be discontinued.
 
 
 126
 Nor do I find support in the record for Judge Sifton's statements that there was "confusion" and "incoherence" on the part of the Board as to the reasons the books were being removed, that the matter was pursued by the Board in an "informal or dilatory manner," that there was an "ex post facto appointment of a review committee", that there was "strong opposition of professional personnel, including the District Superintendent", and that some of the books were appropriate for educational purposes because they were written by "recognized authors". The reasons for discontinuance of the books have been clearly stated by the Board members and are supported by the text of the books themselves. There was nothing dilatory, informal or unfair about the procedure adopted for determining whether the books should be discontinued. The initial removal on March 3, 1976, was solely for the purpose of enabling the Board to read and review the books, and did not represent a discontinuance of them as part of the curriculum. The period required to enable the 7-person Board and the 8-person Committee to read the few available copies and for the Board to reach a final decision with respect to the educational suitability of the books was reasonable. There is no evidence that during this period any faculty or students needed the books for educational purposes. Indeed, for at least a month and a half of the period New York public schools were not in session.
 
 
 127
 Nor was the appointment of the Committee "ex post facto." Although some Board members, after reading some of the books, had expressed the view that the books were inappropriate, the Board did not make a final decision until July 28, 1976, at which time it demonstrated its open-mindedness by deciding that two volumes, Laughing Boy and Black Boy, should be retained as part of the curriculum and at least three Board members, including Vice-President Martin, changed their initially expressed views as to others. There was nothing irrational about the Board's refusal to accept some of the Committee's recommendations. The procedure by which the Board reached its decisions was eminently fair, final action being taken only after much debate, public meetings, and receipt of a report from the specially-appointed Committee. Lastly, although we may differ as to the merits of the Board's action, its rationality is manifest, being based on the text and contents of the books themselves, which the majority studiously avoids discussing. There was thus no impropriety in the procedures used by the Board to reach its decision.
 
 
 128
 For several reasons I cannot agree with Judge Newman's view that the case should be remanded for a trial to determine whether the Board's action was a "politically motivated effort to suppress ideas". In the first place, the term "politically motivated" is amorphous. If this phrase means a desire to implement the Board's conservative philosophy with respect to educational policies in the choice of books for the school's library, there is nothing constitutionally impermissible about the Board's adopting such a view, which apparently accords with the views of the community of the Island Trees Union Free School District. Zykan, supra, 631 F.2d at 1305. Those who disagree may avail themselves of democratic election processes, which they apparently have done without success. The evidence, moreover, is clear that the injection of the "book issue" into the election of Board members and teacher labor disputes was not initiated by the Board but by the media and persons who disagreed with the Board's policy. For a federal court to inject itself into this type of local imbroglio is in my view unwise.
 
 
 129
 The important fact is not whether the Board's decision was "politically" motivated, whatever that means, but whether the discontinuance of the eight books threatens to suppress any discussion of ideas by students or teachers. On this issue the evidence is overwhelming, if not conclusive, that no ideas are being suppressed. Removal of a few books and denial of self-expression by a student body are separate concepts. Both sides agree that students and teachers remain free to discuss the ideas in the books.
 
 
 130
 Even if the Board's motivation were a factor, and I doubt whether it plays any material role in this case, the quoted texts from the books, the Board's contemporaneous expressions, and the later affidavits of its members, none of which were refuted as required by Rule 56(e), F.R.Civ.P.,[9] demonstrate beyond cavil that the Board acted on rational grounds and not with the purpose of suppressing any ideas.
 
 
 131
 Appellants' reliance on Minarcini v. Strongsville City School District, 541 F.2d 577 (6th Cir. 1976), which refused to follow President's Council, is misplaced. To the extent that Minarcini relied on the intervening Supreme Court decision in Virginia State Board of Pharmacy, supra, I have noted that since the publishers and authors of the removed books have and can claim no constitutional right to maintenance of their books in the School library, no reciprocal Virginia State Board right on the part of students to receive the books exists and that decision does not apply here. Moreover, the Minarcini court's reasoning that, although a school board may lawfully refuse to acquire a book for a school library it may not remove a book once acquired, is logically flawed. If a school board has the right to select a book to be placed on school library shelves, and neither of my brothers question that right, it has an equal right to remove them. As Judge Mulligan aptly stated in President's Council, "the concept of a book acquiring tenure by shelving is indeed novel and unsupportable under any theory of constitutional law we can discover," 457 F.2d at 293. Accord, Zykan, supra, 631 F.2d at 1308. A school board may remove a book upon rationally concluding that it made a mistake in acquiring the book in the first place.
 
 
 132
 In short, the First Amendment entitles students to reasonable freedom of expression but not to freedom from what some may consider to be excessively moralistic or conservative selection by school authorities of library books to be used as educational tools. A secondary school authority's regulatory function includes the power to refuse to continue in the school's library collection books that are rationally found unsuitable for educational purpose. This action does not violate any First Amendment rights of the student body. I would therefore affirm Judge Pratt's decision.
 
 
 133
 NEWMAN, Circuit Judge, concurring in the result:
 
 
 134
 The use of governmental power to condemn a book touches the central nervous system of the First Amendment. The core value of the First Amendment is the free expression of ideas. Books communicate ideas, more permanently and often more persuasively than any other form of expression. Perhaps no single event has more evocative power to signal the suppression of free speech than the burning of a book. If this case involved governmental prohibition of a book because of its political content, there is no doubt the panel would be unanimous in finding a First Amendment violation. But the case is not so simple. It involves books, and governmental power is alleged to have been motivated at least in part by the political content of the books. But the governmental action is not prohibition, it is removal from one location-a school library. And the action is sought to be justified by the acknowledged power of school authorities to make decisions concerning the education of children. Not surprisingly, a case of this sort elicits differing judicial responses. Judge Sifton would decide the case in favor of the plaintiffs. Judge Mansfield would decide the case in favor of the defendants. In my view the case presents a sufficient claim of constitutional violation, but requires a trial to determine whether the claim is supported by the facts.
 
 
 135
 Applying First Amendment principles in the context of public schools is a subtle and complex endeavor. Neither "students (n)or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Independent School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), but it is equally clear that the school context profoundly affects the nature of their rights. It must be recognized that schools are specialized environments devoted to the inculcation of both knowledge and social values in children, that our society has made a political decision to grant its public school authorities considerable discretion in determining how that educational process is to occur, and that such a process, by its very nature, involves informal, day-to-day relationships that are normally inappropriate for legal supervision. It is not a First Amendment violation every time a teacher tells a student not to speak, nor does a school administrator violate the First Amendment every time he includes one subject in the educational curriculum and excludes another. The school library is also subject to broad control by school authorities; as a general matter, they may decide how the library should be administered, which books should be acquired, and which books should be removed.
 
 
 136
 The plenary power of school officials transgresses First Amendment limits, however, when their actions tend to suppress ideas. It is one thing to teach, to urge the correctness of a point of view.[1] But it is quite another to take any action that condemns an idea, that places it beyond the pale of free discussion and scrutiny. Teaching implies that the strengths and weaknesses of ideas will be closely examined. Some will be favored, others criticized. This is the academic freedom that has its own strong claim to First Amendment protection. See Epperson v. Arkansas, 393 U.S. 97, 116, 89 S.Ct. 266, 276, 21 L.Ed.2d 228 (1968) (Stewart, J., concurring); Wilson v. Chancellor, 418 F.Supp. 1358 (D. Or. 1976); Parducci v. Rutland, 316 F.Supp. 352 (M.D. Ala. 1970); cf. Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1975) (university level). But the First Amendment does not permit the freedom of the teacher to become an instrument for suppression of the thoughts of the students. Nor may any school official take action that tends to suppress ideas within the school community. Teachers and students alike have a right to freedom from "a pall of orthodoxy." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); see Cary v. Board of Education, 427 F.Supp. 945, 956 (D. Colo. 1977).
 
 
 137
 The suppression of ideas against which the First Amendment protects need not be manifested by action taken directly against a student, see Tinker v. Des Moines Independent School District, supra, or a teacher, Keyishian v. Board of Regents, supra; Sweezy v. New Hampshire, supra. Prohibiting expression of views is obviously the most obnoxious violation of the First Amendment, and regulation that only restricts free expression merits the most careful scrutiny. In an open society like our own, acts of disapproval by public authorities, unaccompanied by any imposed or threatened sanctions, will generally not create sufficient risk of suppressing ideas to warrant judicial intervention. Consequently, claims of this sort have rarely been raised.[2] In the school setting, however, where a group of relatively "impressionable children," James v. Board of Education, supra, are compelled to attend and pay attention, official action carries an undue risk of suppressing ideas. Those in a school community have a right to be free not only from prohibition and unwarranted regulation of expression. They have a right to be free from official conduct that tends to suppress ideas-conduct conveying the message that some idea or viewpoint is not merely unsound, but is not acceptable to be aired within the school community.[3] First Amendment values are not only precious; they are fragile. In the context of this case they are easily threatened by inhibiting action that stops short of prohibition or restrictive regulation.[4]
 
 
 138
 Of course actions of school officials tending to suppress ideas must be sufficiently specific and serious to trigger First Amendment inquiry. Cf. Aebisher v. Ryan, 622 F.2d 651 (2d Cir. 1980). To regard every disapproving comment as a potential First Amendment violation would unduly intrude upon the prerogatives of the school authorities. A different situation is presented, however, when school authorities take clearly defined and carefully planned action to condemn an idea, especially when such action is taken with respect to an entire school or school district. The implication of such action is unmistakable, and its inhibiting effect is likely to be significant.
 
 
 139
 The removal of a book from a school library will often be the sort of clearly-defined, school-wide action that carries with it the potential for impermissible suppression of ideas. It is possible, of course, for removal to be a casual, insignificant decision, as when the school librarian replaces an obsolete book, or discards a rarely-used one to make shelf space available for other volumes. But the deliberate decision, taken by leading school officials, that a book is to be removed from the school library because of its ideas can hardly be placed in the same category. Actions such as these can too easily lead to suppression. They signal to the students and the teachers an official message that the ideas presented in those books are unacceptable, are wrong, and should not be discussed or considered. The chilling effect of this message on those who would express the idea is all too apparent.
 
 
 140
 The symbolic effect of a school's action in removing a book solely because of its ideas will often be more significant than the resulting limitation upon access to it. The fact that the book barred from the school library may be available elsewhere is not decisive. What is significant is that the school has used its public power to perform an act clearly indicating that the views represented by the forbidden book are unacceptable. The impact of burning a book does not depend on whether every copy is on the fire. Removing a book from a school library is a less offensive act, but it can also pose a substantial threat of suppression.[5]
 
 
 141
 The risk that removing a book from a library will communicate suppression of an idea is markedly increased when the decision to remove is politically motivated. While the mere act of singling out a certain type of speech for disapproval will often be sufficient to render the state's action impermissible, this is not necessarily true in the context of schools. The latitude properly accorded to teaching must tolerate some expressions of disapproval, not only of inappropriate conduct but even of disfavored ideas. But when the disapproval is political in nature-when exclusion of particular views is motivated by the authorities' opinion about the proper way to organize and run society in general-then it verges into impermissible suppression.
 
 
 142
 There may be motivations other than political that increase the risk that removing books will be perceived as condemning unacceptable views and thereby risk suppression of those views. But political thought is a particularly important and sensitive area. Our society depends for its choice of leaders and its basic policy decisions on the independent thinking of its citizens, and on the vitality of the marketplace of ideas, see Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (Holmes, J., dissenting). As the Supreme Court has stated, "speech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 215-216, 13 L.Ed.2d 125 (1964). Education plays a significant role in preparing students for these responsibilities of citizenship. See Wisconsin v. Yoder, 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972); Wieman v. Updegraff, 344 U.S. 183, 194, 73 S.Ct. 215, 220, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring). When schools are used to suppress independent thinking, rather than to encourage it, they threaten the very process they are designed to foster. Moreover, politics is an area where feelings naturally run high, and the temptation for state officials to impose their views on those within their power is too often present. Special vigilance is needed to ensure that schools are not used in this manner.
 
 
 143
 Prior to this case and Bicknell v. Vergennes Union High School Board of Directors, 638 F.2d 438 (2d Cir. 1980), also decided this day, at least five federal courts have considered First Amendment challenges to the removal of books from school libraries. Three of these courts have concluded that the challenged removal was unconstitutional. Minarcini v. Strongsville City School District, 541 F.2d 577 (6th Cir. 1976); Salvail v. Nashua Board of Education, 469 F.Supp. 1269 (D.N.H.1979); Right to Read Defense Committee v. School Committee, 454 F.Supp. 703 (D.Mass.1978). A fourth case, decided by this Court, held that the challenged book removal did not violate the First Amendment. Presidents Council, District 25 v. Community School Board No. 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). Presidents Council characterized the infringement of First Amendment rights as "minuscule" on the basis of the facts of that case. Id. at 292. A single book had been removed because of its "obscenities and explicit sexual interludes," id. at 291, and no political motivation for that removal was alleged or proven. Presidents Council did not hold that the removal of books would not constitute a First Amendment violation if that action had the effect of discouraging or suppressing particular political ideas. In fact, the Court explicitly noted that the case involved "no showing of a curtailment of freedom of speech or thought." Id. at 293. The fifth case, recently decided by the Seventh Circuit, also found no constitutional violation on the facts as pleaded, but remanded the case to afford the plaintiffs an opportunity to amend their complaint to allege that the book removal was part of an effort to remove volumes conflicting with the school board's "orthodoxy." Zykan v. Warsaw Community School Corp., 631 F.2d 1300, 1308 (7th Cir. 1980). Judge Swygert concurred in the result, concluding that the complaint was already sufficient to require trial on the claim that the book removal burdened free expression because several of the books dealt with the topic of feminism. Id. at 1309.
 
 
 144
 Presidents Council establishes that the act of removing a book from a school library does not, by itself, violate constitutional rights. As the Court said, the "concept of a book acquiring tenure by shelving is indeed novel and unsupportable under any theory of constitutional law we can discover." Ibid. The right at issue is not that of the book; it is the right of the students and other members of the school community. Their rights are impaired when books are the focal point of official action designed to suppress the ideas that the books contain. In some circumstances even the action of not acquiring a book could inhibit free expression within the school, but normally removal of a book will more likely risk an impermissibly inhibiting effect. To refuse to acquire a book merely makes that book one of innumerable others that have not been acquired, unless, because of extraordinary attention already drawn to that book, it has been specifically barred from acquisition. On the other hand, removal singles out that book for disapproval. In addition, removal, more than failure to acquire, is likely to suggest that an impermissible political motivation may be present. There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity. Thus book removal has an evidentiary significance for determining whether the action of school authorities has created a sufficient risk of suppressing ideas to establish a First Amendment violation.
 
 
 145
 On this view of First Amendment principles, I conclude that the judgment of the District Court granting summary judgment for the defendants must be reversed, and the matter remanded for fact-finding. The allegations of the plaintiffs, fully presented in Judge Sifton's opinion, are clearly adequate, if proved, to sustain the conclusion that the school has violated the First Amendment. It is conceded that nine books were removed from the Island Trees High School and Junior High School libraries. There is no claim that shelf space was scarce or that these books contained obsolete or disproven statements of fact. These books were singled out for disapproval. There is also no question that the removal was a positive, clearly-defined act by school authorities. By the time the books were removed, the action had become a major policy decision, and there could be little doubt in the minds of the Island Trees students about the message that the school authorities intended to communicate.
 
 
 146
 Plaintiffs rely on numerous uncontested facts to contend that the removal was designed to suppress ideas. They point to the fact that three members of the School Board, Ahrens, Martin, and Hughes, became concerned about the book issue when attending a conference sponsored by an issue-oriented education group known as PONY-U.[6] The book list distributed at this conference identifies the objectionable nature of many of the books by a number of comments on the ideas or viewpoints of the books. A Reader for Writers, for example, is marked for condemnation because it "equates Malcolm X, considered by many to be a traitor to this country, with the founding fathers of our country." Soul on Ice is described as "full of anti-American material and hate for white women." Moreover, several of the comments in the newsletter distributed by the Board and in the affidavits and depositions of Board members also indicate concern with what are portrayed as objectionable ideas.[7]
 
 
 147
 The defendants dispute any politically motivated effort to suppress ideas, contending that the books were removed because of vulgar language and explicit sexual descriptions, matters on which school authorities have considerable latitude. See Thomas v. Board of Education, 607 F.2d 1043, 1053 (2d Cir. 1979) (Newman, J., concurring); Frison v. Franklin County Board of Education, 596 F.2d 1192 (4th Cir. 1979); Brubaker v. Board of Education, 502 F.2d 973 (7th Cir. 1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). If at trial the defendants offer to justify the removal on this ground, the trial court must be satisfied that the school's policing of language has not exceeded even the generous First Amendment limits appropriate in the context of young students. Moreover, the bona fides of a school's claim of concern with vulgarity or sexual explicitness may be refuted by evidence that other books with similar passages were not removed. A school's effort to regulate vulgarity is not unconstitutional because it is not completely thorough, but if only isolated examples are condemned, the inference will be strengthened that vulgarity was the excuse, not the reason, for book removal whose principal, or at least partial motivation was political.
 
 
 148
 Judge Mansfield, in dissent, is confident that the Board removed the books solely in the exercise of its acknowledged power to regulate vulgar and sexually explicit materials. In the absence of a trial, I am unable from this vantage point to perform similar fact-finding as to the true motives of the Board members. However, I am satisfied that the Board members' self-professed motives, as set forth in their affidavits, should not be accepted without a trial, especially in light of the evidence the plaintiffs have offered to submit to show that the Board members' motivation was significantly political. Indeed one basis for doubting that their motivation was solely concerned with the vulgarity and sexual explicitness is set forth in the dissenting opinion. The books were removed, the dissent observes, because they contain "either vulgar and indecent language, profanities, explicit sex, sexual perversion, poor grammar, glorification of sex and drugs, or anti-Jewish, anti-Black, or anti-Christian remarks." Infra, p. 6063 (emphasis added). And, as Judge Mansfield acknowledges, the removal of A Reader for Writers cannot even be claimed to be attributed to any of these rather varied motives. That book, according to the dissent, was removed because of the book's bad taste in including Jonathan Swift's "A Modest Proposal," the classic satire suggesting that overpopulation and hunger among the Irish should be solved by eating 100,000 Irish children. Surely a fact issue concerning motive is created when the plaintiffs offer to prove (and defendants do not deny) that this book was originally marked for removal because the PONY-U organization objected to the book's inclusion of a different selection, the one containing laudatory comments about Malcolm X.[8]
 
 
 149
 The possibility of mixed motivation-permissible concern with vulgarity or sexual explicitness and impermissible concern with political content-could call into question the relevance of the Supreme Court's decision in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Mt. Healthy held that an untenured teacher may be dismissed for a legitimate reason related to teaching performance, even if an impermissible reason, expression of protected speech, also entered into the decision to dismiss. This might suggest that a school's permissible reason for removal of books would suffice, even though an impermissible reason also motivated the decision. However, in many contexts the existence of an impermissible motivation renders the challenged action unlawful, even if that motivation is not exclusive. See, e. g., Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1042 (2d Cir. 1979) (racial discrimination); Williams v. Matthews Co., 499 F.2d 819, 826 (8th Cir. 1974) (same); NLRB v. J. P. Stevens & Co., 563 F.2d 8, 20 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978) (union harassment); NLRB v. Jamestown Sterling Corp., 211 F.2d 725 (2d Cir. 1954) (same).
 
 
 150
 The Mt. Healthy exception to the more traditional response to mixed motivation should not apply to a school's decision to remove library books. The Mt. Healthy rule was designed to avoid placing the teacher "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." 429 U.S. at 285, 97 S.Ct. at 575. That reasoning has no application to the removal of a book, which neither exercises a protected right nor can be viewed as gaining by "doing nothing." Moreover, assessing even the alleged permissible motivation for removing a book always involves some consideration of First Amendment protection, for it is that Amendment that determines how far school authorities may go in maintaining standards of decency in expression. See Thomas v. Board of Education, supra, 607 F.2d at 1057-58. By contrast, the sufficiency of permissible grounds for dismissing an untenured teacher may, in many instances, be assessed without any consideration of First Amendment protection. Finally, the content of a book and its manner of expression are too intimately related to be subjected to entirely separate analysis. The untenured teacher's misconduct in the classroom can be analyzed entirely separately from his out-of-school protected expression. But ideas and the language used to express them always are related. See Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). Because of that relationship First Amendment values would be imperiled if a motivation concerned with the language of a book were permitted to justify an act of suppression also motivated by the book's political content.
 
 
 151
 In this case plaintiffs have alleged that the removal of books from the Island Trees School library was motivated in part by the School Board's objection to the political views expressed in those books. The complaint further alleges that this politically motivated action was taken under circumstances that pose a threat to the free expression and exchange of ideas within the school community that is protected by the First Amendment. In opposing the defendants' motion for summary judgment, the plaintiffs have submitted substantial evidence to support their claim. A trial is required to determine precisely what happened, why it happened, and whether, in the circumstances of this case, the School Board's actions, looking forward from the time they were taken,[9] created a sufficient risk of suppressing ideas to constitute a violation of the First Amendment.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 The complaint was originally filed in state court and was thereafter removed to federal district court pursuant to 28 U.S.C. § 1441. Plaintiffs' motion to remand to the state court was denied, a ruling not complained of here and which was, in all events, correct, since the complaint raised substantial issues which the federal court had jurisdiction to decide under 28 U.S.C. § 1343. See 28 U.S.C. § 1441(b)
 
 
 [2]
 The books at issue are: The Fixer, by Bernard Malamud; Slaughterhouse Five, by Kurt Vonnegut; The Naked Ape, by Desmond Morris; Down These Mean Streets, by Piri Thomas; Best Short Stories by Negro Writers, edited by Langston Hughes; Go Ask Alice, by an anonymous author; A Hero Ain't Nothing But a Sandwich, by Alice Childress; Black Boy, by Richard Wright; Laughing Boy, by Oliver LaFarge; Soul on Ice, by Eldridge Cleaver; and an anthology entitled, A Reader for Writers, edited by Jerome Archer
 
 
 [3]
 Union Free School Districts are the product of New York State's first attempt in 1853 to encourage rural school districts to consolidate resources in an effort to enrich elementary education and make possible secondary school facilities not otherwise available to the separate communities. L.1853, c. 433. Graves, "Development of the Education Law in New York," McKinney's Education Law, Sections 1 to 600, pp. xxi-xxii (1969 Ed.)
 
 
 [4]
 The entry for Oliver LaFarge's Laughing Boy reads in its entirety as follows:
 "Laughing Boy by Oliver LaFarge
 "Page 38-'I tell you, she is all bad; for two bits she will do the worst thing.'
 "Pages 258-9-'I was frightened when he wanted me to lie with him, but he made me feel all right. He knew all about how to make women forget themselves, that man.' "
 
 
 [5]
 An affidavit of defendant Martin states he made a second list entitled "Objectionable Books" from the materials acquired at the conference. Since this list includes titles and authors beyond those covered by the lists identified as acquired at the Watkins Glen conference, e. g., Why I am not a Christian, by Bertrand Russell; Law and the Consumer ; and Down These Mean Streets, by Richard Yates (sic), it seems clear either that lists were obtained at the Watkins Glen conference which are not part of the record, or that other sources were consulted by Martin
 
 
 [6]
 According to Ahrens, "I think we mentioned our concerns to the other board members and to the (District) Superintendent in a rather informal manner" at an executive session of the Board in November. The Board also met in January
 
 
 [7]
 Superintendents of Union Free School Districts possess the following powers, among others, under New York Education Law 1711(5):
 "a. To be the chief executive officer of the school district and the educational system, and to have the right to speak on all matters before the board, but not to vote.
 "c. To prepare the content of each course of study authorized by the board of education....
 "d. To recommend suitable lists of textbooks to be used in the schools.
 "f. To have supervision and direction over ... all other matters pertaining to ... libraries, lectures, and all other education activities under the management, direction and control of the board of education."
 
 
 [8]
 Apparently, in March the union had filed a grievance against the Board stating that the Board had violated this clause of the union contract
 
 
 [9]
 Neither this recommendation nor any of the other recommendations made by formal vote of the committee at later meetings in May and June were acted upon prior to the July Board of Education meeting when all of the committee's recommendations were considered together
 
 
 [10]
 Manual for Complex Litigation, Sec. 1.41 (1973). Compare AAMCO Automatic Transmissions, Inc. v. Tayloe, 67 F.R.D. 440, 447 (E.D.Pa.1975) and Weight Watchers of Philadelphia v. Weight Watchers International, 53 F.R.D. 647 (E.D.N.Y.1971) with Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y.1974). Cf. Coles v. Marsh, 560 F.2d 186 (3d Cir.), cert. denied, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977). And see Erhardt v. Prudential Group, Inc., 429 F.2d 843 (2d Cir., 1980)
 
 
 [11]
 It is significant that the precise language of Justice Fortas' decision in Tinker v. Des Moines School District, supra, 393 U.S. at 514, 89 S.Ct. at 740, defining the boundaries of permissible regulation of student speech became incorporated in a school board rule regulating the distribution of literature on school premises which this Court was obliged to strike down in Eisner v. Stamford Board of Education, 440 F.2d 803, 807 (2d Cir. 1971). As noted by this Court in Thomas v. Board of Education, supra, 607 F.2d at 1049, First Amendment problems in the school area "are not easy of solution and much depends upon the specific facts before us."
 
 
 [12]
 Thus, although both James and Taylor involved school regulations barring the wearing of black arm bands in secondary schools to protest the Vietnam war, this Court noted in James, supra, "there is merit to appellees' argument that Tinker does not control this case." 461 F.2d at 573. Tinker itself cited with approval both Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966) and Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966) decided on the same day by the same panel, one upholding and the other striking down school board regulations prohibiting the wearing of freedom buttons on school property, because of a difference in the manner in which the children wearing the buttons had comported themselves at the two schools involved. Tinker v. Des Moines School District, supra, 393 U.S. at 509, 513, 89 S.Ct. at 737, 740
 
 
 [13]
 Judge Newman concludes that a trial is required to determine the effect of defendants' conduct on plaintiffs' exercise of their first amendment rights, since plaintiffs have not been threatened with punishment for expressing ideas contained in the offending books. As Judge Newman points out in his opinion, however, what is at issue is the degree of risk that ideas will be suppressed as a result of defendants' conduct. Once all copies of the books containing the offending ideas have been ordered removed from the school library under the circumstances here presented, it hardly requires a trial, in my view, to determine that the risk is overwhelming that students will conclude that they are not at liberty to express the same thoughts themselves and that they will be appropriately punished if they do so. To hold, as Judge Newman would, that potential plaintiffs must, when faced with similar conduct by school boards in the future, contemplate the prospect of plenary trial in our congested district courts in order to vindicate their First Amendment rights is, in my view, to impose too great a burden on free speech
 Judge Mansfield is mistaken in reading the majority opinion as condemning the application by school boards of personal taste, political beliefs or local community standards to decisions concerning the contents of school libraries in this Circuit. Cf. Zykan v. Warsaw Community School Corp., 631 F.2d 1300 (7th Cir., 1980). The opinion says the contrary. There is, however, a difference between applying one's personal taste or political views to the formulation of school policy and simply requiring conformity by students and teachers with subjective and intangible standards of personal morality or political philosophy. What is required in order to avoid the effect of governing school affairs simply by a vague and indefinite pall of orthodoxy is the development of a set of sufficiently objective criteria for the identification of speech which will be objected to and a sufficiently regular procedure for applying those criteria in concrete cases to permit students to determine with a reasonable degree of certainty what speech will be prohibited and when. This is not accomplished by the Board's March Newsletter to all families in the District expressing the Board's loosely stated findings ("... the books ... contain material that is offensive to Christians, Jews, Blacks, and Americans in general. In addition, these books contain obscenities, blasphemies, brutality, and perversion beyond description"), its peremptory conclusion ("... we all agree that these books simply DO NOT belong in the school libraries ..."), and its vague warning ("It is our duty, our moral obligation, to protect the children of our schools from this moral danger as surely as from physical and medical dangers"). This message, of course, preceded the April appointment of the book review committee as well as the later efforts by the Board members, in response to the plaintiffs' motion for summary judgment in this case, to explain their actions principally, although still not entirely, in terms of the books' vulgarity and indecency. Nothing in this later history, in my view, serves to dispel the effect upon first amendment rights of the Board's initial manner of dealing with the issue, and, as noted in the body of this opinion, much occurred thereafter which only served to make the situation worse.
 
 
 [1]
 The excerpts which led the Board to look into the educational suitability of the books in question are set out (with minor corrections after comparison with the text of the books themselves) below. The pagination and the underlinings are retained from the original report used by the board. In newer editions of some of the books, the quotes appear at different pages
 1) SOUL ON ICE by Eldridge Cleaver
 PAGE QUOTE
 157-158 "... There are white men who will pay you to fuck their wives. They approach you and say, 'How would you like to fuck a white woman?' 'What is this?' you ask. 'On the up-and-up,' he assures you. 'It's all right. She's my wife. She needs black rod, is all. She has to have it. It's like a medicine or drug to her. She has to have it. I'll pay you. It's all on the level, no trick involved. Interested?' You go with him and he drives you to their home. The three of you go into the bedroom. There is a certain type who will leave you and his wife alone and tell you to pile her real good. After it is all over, he will pay you and drive you to wherever you want to go. Then there are some who like to peep at you through a keyhole and watch you have his woman, or peep at you through a window, or lie under the bed and listen to the creaking of the bed as you work out. There is another type who likes to masturbate while he stands beside the bed and watches you pile her. There is the type who likes to eat his woman up after you get through piling her. And there is the type who only wants you to pile her for a little while, just long enough to thaw her out and kick her motor over and arouse her to heat, then he wants you to jump off real quick and he will jump onto her and together they can make it from there by themselves."
 2) A HERO AIN'T NOTHING BUT A SANDWICH by Alice Childress
 PAGE QUOTE
 
 
 [10]
 "Hell, no! Fuck the society
 64-65 "The hell with the junkie, the wino, the capitalist, the welfare checks, the world ... yeah, and fuck you too!"
 75-76 "They can have back the spread and curtains, I'm too old for them fuckin bunnies anyway."
 3) THE FIXER by Bernard Malamud
 PAGE QUOTE
 
 
 [52]
 "What do you think goes on in the wagon at night: Are the drivers on their knees fucking their mothers?"
 
 
 [90]
 "Fuck yourself, said the blinker, etc."
 
 
 [92]
 "Who else would do anything like that but a motherfucking Zhid?"
 
 
 [146]
 "No more noise out of you or I'll shoot your Jew cock off."
 
 
 [189]
 "Also there's a lot of fucking in the Old Testament, so how is that religious?"
 
 
 [192]
 "You better go fuck yourself, Bok, said Kogin, I'm onto your Jew tricks."
 
 
 [215]
 "Ding-dong, giddyap. A Jew's cock's in the devil's hock."
 
 
 [216]
 "You cocksucker Zhid, I ought to make you lick it up off the floor."
 4) GO ASK ALICE by Anonymous
 PAGE QUOTE
 
 
 [31]
 "I wonder if sex without acid could be so exciting, so wonderful, so indescribable. I always thought it just took a minute, or that it would be like dogs mating."
 
 
 [47]
 "Chris and I walked into Richie and Ted's apartment to find the bastards stoned and making love to each other ... low class queer."
 
 
 [81]
 "shitty, goddamned, pissing, ass, goddamned beJesus, screwing life's, ass, shit. Doris was ten and had humped with who knows how many men in between ... her current stepfather started having sex with her but good ... sonofabitch balling her"
 
 
 [83]
 "but now when I face a girl its like facing a boy. I get all excited and turned on. I want to screw with the girl...."
 
 
 [84]
 "I'd rather screw with a guy ... sometimes I want one of the girls to kiss me. I want her to touch me, to have her sleep under me."
 
 
 [84]
 "Another day, another blow job ... If I don't give Big Ass a blow he'll cut off my supply ... and LittleJacon is yelling, 'Mama, Daddy can't come now. He's humping Carla.' "
 
 
 [85]
 "Shit, goddamn, goddamn prick, son-of-a-bitch, ass, pissed, bastard, goddamn, bullshit
 
 
 [94]
 "I hope you have a nice orgasm with your dog tonight."
 
 
 [110]
 "You fucking Miss Polly pure
 
 
 [117]
 "Then he said that all I needed was a good fuck."
 
 
 [146]
 "It might be great because I'm practically a virgin in the sense that I've never had sex except when I've been stoned...."
 5) SLAUGHTERHOUSE FIVE by Kurt Vonnegut, Jr.
 PAGE QUOTE
 
 
 [29]
 " 'Get out of the road, you dumb motherfucker.' The last word was still a novelty in the speech of white people in 1944. It was fresh and astonishing to Billy, who had never fucked anybody ..."
 
 
 [32]
 "You stake a guy out on an anthill in the desert-see? He's facing upward, and you put honey all over his balls and pecker, and you cut off his eyelids so he has to stare at the sun till he dies."
 
 
 [34]
 "He had a prophylactic kit containing two tough condoms 'For the prevention of disease only!' ... He had a dirty picture of a woman attempting sexual intercourse with a shetland pony."
 
 
 [94]
 & 95 "But the Gospels actually taught this: Before you kill somebody, make absolutely sure he isn't well connected ... The flaw in the Christ stories, said the visitor from outer space, was that Christ who didn't look like much, was actually the son of the Most Powerful Being in the Universe. Readers understood that, so, when they came to the crucifixion, they naturally thought .. Oh boy-they sure picked the wrong guy to lynch this time! And that thought had a brother: There are right people to lynch. People not well connected .... The visitor from outer space made a gift to Earth of a new Gospel. In it, Jesus really WAS a nobody, and a pain in the neck to a lot of people with better connections than he had .... So the people amused themselves one day by nailing him to a cross and planting the cross in the ground. There couldn't possibly be any repercussions, the lynchers thought .. since the new Gospel hammered home again and again what a nobody Jesus was. And then just before the nobody died .... The voice of God came crashing down. He told the people that he was adopting the bum as his son ... God said this: From this moment on, He will punish horribly anybody who torments a bum who has no connections."
 
 
 [99]
 "They told him that there could be no Earthling babies without male homosexuals. There could be babies without female homosexuals."
 
 
 [120]
 "Why don't you go fuck yourself? Don't think I haven't tried .. he was going to have revenge, and that revenge was sweet ... It's the sweetest thing there is, said Lazzaro. People fuck with me, he said, and Jesus Christ are they ever fucking sorry."
 
 
 [122]
 "And he'll pull out a gun and shoot his pecker off. The stranger'll let him think a couple of seconds about who Paul Lazzaro is and what life's gonna be like without a pecker. Then he'll shoot him once in the guts and walk away. ... He died on account of this silly cocksucker here. So I promised him I'd have this silly cocksucker shot after the war."
 
 
 [134]
 "In my prison cell I sit ... With my britches full of shit, And my balls are bouncing gently on the floor. And I see the bloody snag when she bit me in the bag ... Oh, I'll never fuck a Polack any more."
 
 
 [173]
 "And the peckers of the young men would still be semierect, and their muscles would be bulging like cannonballs."
 
 
 [175]
 "They didn't have hard-ons ... Everybody else did."
 
 
 [177]
 "The magazine, which was published for lonesome men to jerk off to."
 
 
 [178]
 "and one critic said.... 'To describe blow-jobs artistically.' "
 6) THE BEST SHORT STORIES BY NEGRO WRITERS Ed. by Langston Hughes
 PAGE QUOTE
 
 
 [176]
 "like bat's shit and camel piss,"
 
 
 [228]
 "that no-count bitch of a daughter of yours is up there up North making a whore of herself."
 
 
 [237]
 "they made her get out and stand in front of the headlights of the car and pull down her pants and raise her dress-they said that was the only way they could be sure. And you can imagine what they said and what they did-."
 
 
 [303]
 "You need some pussy. Come on, let's go up to the whore house on the hill."
 "Oh, these bastards, these bastards, this God damned Army and the bastards in it. The sons of bitches!"
 
 
 [436]
 "he produced a brown rag doll, looked at her again, then grabbed the doll by its legs and tore it part way up the middle. Then he jammed his finger into the rip between the doll's legs. The other men laughed...."
 
 
 [444]
 "The pimps, hustlers, lesbians, and others trying to misuse me."
 
 
 [462]
 "But she had straight firm legs and her breasts were small and upright. No doubt if she'd had children her breasts would be hanging like little empty purses."
 
 
 [464]
 "She first became aware of the warm tense nipples on her breasts. Her hands went up gently to clam them." "In profile, his penis hung like a stout tassle. She could even tell that he was circumcised."
 
 
 [406]
 "Cadillac Bill was busy following Luheaster around, rubbing her stomach and saying, 'Magic Stomach, Magic Stomach, bring me a little baby cadillac.' " "One of the girls went upstairs with Red Top and stayed for about forty five minutes."
 7) BLACK BOY by Richard Wright
 PAGE QUOTE
 70-71 "We black children-seven or eight or nine years of age-used to run to the Jew's store and shout:
 ... Bloody Christ Killers
 Never trust a Jew
 Bloody Christ Killers
 What won't a Jew do ...
 Red, white and blue
 Your pa was a Jew
 Your ma a dirty dago
 What the hell is you?"
 
 
 [265]
 "Crush that nigger's nuts, nigger!" "Hit that nigger!" "Aw, fight, you goddam niggers!" "Sock 'im, in his f-k-g piece!" "Make 'im bleed!"
 8) LAUGHING BOY by Oliver LaFarge
 PAGE QUOTE
 
 
 [38]
 "I'll tell you, she is all bad; for two bits she will do the worst thing."
 258-9 "I was frightened when he wanted me to lie with him, but he made me feel all right. He knew all about how to make women forget themselves, that man."
 9) THE NAKED APE by Desmond Morris
 PAGE QUOTE
 73-74 "Also, the frontal approach provides the maximum possibility for stimulation of the female's clitoris during the pelvic thrusting of the male. It is true that it will be passively, stimulated by the pulling effect of the male's thrusts, regardless of his body position in relation to the female, but in a face-to-face mating there will in addition be the direct rhythmic pressure of the male's pubic region on to the clitoral area, and this will considerably heighten the stimulation ..." "So it seems plausible to consider that face-to-face copulation is basic to our species. There are, of course, a number of variations that do not eliminate the frontal element: male above, female above, side by side, squatting, standing, and so on, but the most efficient and commonly used one is with both partners horizontal, the male above the female...."
 
 
 [80]
 "... This broadening of the penis results in the female's external genitals being subjected to much more pulling and pushing during the performance of pelvic thrusts. With each inward thrust of the penis, the clitoral region is pulled downwards and then, with each withdrawal, it moves up again. Add to this the rhythmic pressure being exerted on the clitoris region by the pubic region of the frontally copulating male, and you have a repeated massaging of the clitoris that-were she a male-would virtually be masturbatory."
 94-99 "... If either males or females cannot for some reason obtain sexual access to their opposite numbers, they will find sexual outlets in other ways. They may use other members of their own sex, or they may even use members of other species, or they may masturbate...."
 10) READER FOR WRITERS. See note 6 infra.
 
 
 [2]
 N.Y. Education Law § 1709 (McKinney's) reads in pertinent part as follows:
 " § 1709. Powers and Duties of Boards of Education
 The said board of education of every union free school district shall have the power and it shall be its duty:
 
 
 [3]
 To prescribe the course of study by which the pupils of the school shall be graded and classified
 
 
 [4]
 To prescribe the text-books to be used in the schools
 
 
 [9]
 To take charge and possession of ... the books, apparatus, and all school property within its district; and the title of the same shall be vested respectively in said board of education
 
 
 [13]
 To have in all respects the superintendence, management and control of said union free schools
 
 
 [33]
 To have in all respects the superintendence, management and control of the educational affairs of the district, and, therefore, shall have all the powers reasonably granted expressly or by implication by this chapter or other statutes."
 § 701 of the Education Law, subdivision 1 states in pertinent part:
 "In the several cities and school districts of the state, boards of education ... shall designate textbooks to be used in the schools under their charge."
 § 91.1 of the Regulations of the Commissioner of Education states:
 "A school library shall be established and maintained in each school. The library in each elementary school shall meet the needs of the pupils, and shall provide an adequate complement to the various areas of the curriculum."
 It also requires a minimum of 1,000 titles each for a junior and senior high school library.
 
 
 [3]
 Judge Sifton's opinion quotes at length (at pp. 409-410) portions of a memorandum by Superintendent Richard G. Morrow to the Board dated February 27, 1976, disapproving a procedure whereby the Board might act unilaterally or precipitously on the basis of excerpts or lists prepared by others without first reading the books. The opinion also quotes portions of a Board press release issued on March 19, 1976, in response to articles in the press regarding the book issue. The impression given by these partial quotations is that the Board had prejudged the issue of whether the 10 books should be discontinued as part of the School's curriculum, had permanently removed them, to which Superintendent Morrow was objecting
 However, the balance of Mr. Morrow's memorandum, as well as his later similar memorandum to the public dated March 30, 1976 (entitled "Statement Concerning the Book Issue"), when the Board held a public hearing on the issue, reveals that he was recommending that a joint parent-school authority Committee be appointed to study the books and make recommendations to the Board. This was substantially the procedure adopted by the Board at its March 30, 1980, public meeting with Superintendent Morrow's approval, and instituted in early April.
 
 
 [4]
 Because of the unavailability of sufficient copies of A Reader for Writers most members of the Committee were unable to read the book within a reasonable length of time and could not therefore make a recommendation
 
 
 [5]
 Judge Mulligan summarized the contents of Down These Mean Streets as follows:
 "The book, which has created the controversy and provoked the action of the Board, Down These Mean Streets, is an autobiographical account by Piri Thomas, of a Puerto Rican youth growing up in the East Side Barrio (Spanish Harlem) in New York City. Predictably the scene is depressing, ugly and violent. The argot of the vicinage is replete with four letter and twelve letter obscenities unreported by Tom Swift or even Tom Jones. Acts of criminal violence, sex, normal and perverse, as well as episodes of drug shooting are graphically described." 457 F.2d 291.
 
 
 [6]
 A Reader for Writers, an anthology edited by Jerome W. Archer and Joseph Schwartz, while not apparently containing vulgar or indecent language, does contain a story which members of the Board considered to be in sufficiently bad taste to justify its removal from the library. An article in the book by Jonathan Swift, entitled A Modest Proposal for Preventing the Children of Poor People in Ireland From Being a Burden to their Parents or Country, suggests at length that the overpopulation problem could be solved by having 100,000 one-year old children slaughtered and served as food, with the skins to be artificially dressed and made into gloves and boots, and describes the proposed process in detail. I cannot label the Board's decision to discontinue the book as irrational or designed to suppress freedom of expression by students, particularly in the absence of evidence that the book was in demand for any of its other writings
 
 
 [7]
 Community values may not be underestimated as a factor to be taken into account by a Board in selecting those books suitable for the part to be played by a school library in performance of the school's educational function. According to the Eighth Annual Gallup Poll of the Public Attitude toward the Public Schools, as reported in Phi Delta Kappa Magazine for October 1976 (which was during the period of the events in question in this case), most persons answered that "high moral standards" represented the quality most neglected by public schools in the overall development of children. Seven out of ten parents replied that schools should share with them the responsibility for the moral behavior of their children
 
 
 [8]
 The parties' statements of facts, about which no dispute exists, filed pursuant to Rule 9(g) of the General Rules of the Southern District of New York, contain the following pertinent provisions:
 Plaintiffs: "Although the books themselves were excluded from use in the schools in any way, defendants have not precluded discussion about the themes of the books or the books themselves."
 Defendants: "No teacher has been instructed not to discuss the books which were removed or to refrain from discussion or comment upon the ideas and positions they represent."
 
 
 [9]
 As we recently reiterated in SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978):
 "Rule 56(e) provides that when a motion for summary judgment is supported by the documents listed in Rule 56(c)-depositions, affidavits, answers to interrogatories, and admissions-an adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion must set forth 'concrete particulars' (citation omitted) ... It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion."
 See also, Donnelly v. Guion, 467 F.2d 290, 291 (2d Cir. 1972); Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).
 
 
 [1]
 This Court has even acknowledged that "a principal function of all elementary and secondary education is indoctrinative." James v. Board of Education, 461 F.2d 566, 573 (2d Cir. 1972). It is clear from the context of this statement that it was simply intended to describe the school's role in transmitting values. As the Court said, "The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom.... Accordingly, courts consistently have affirmed that curriculum controls belong to the political process and local school authorities." Ibid. James pointedly condemns "indoctrination" in the sense of endeavoring to insist that one set of values must be accepted by the students. Ibid. There is no suggestion in James, or in any other federal case, that the power of school officials extends beyond curriculum control to the suppression of ideas
 
 
 [2]
 Another reason why such indirect claims have not been frequently raised is that most actions infringing on free speech are taken against the speaker himself, who generally makes a direct claim that his First Amendment rights are violated. In situations like the present case, however, where an isolated book removal limits the free expression of the author so slightly that he makes no claim on his own behalf, the impact of the government's action on those indirectly affected by it comes to the forefront
 
 
 [3]
 The crucial role of open inquiry in public schools has been increasingly recognized in recent years. See Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969) (teacher may not be dismissed for assigning serious magazine article containing single vulgar word); Cary v. Board of Education, supra (school may not exercise unlimited control over teachers); Parducci v. Rutland, supra (teacher may not be dismissed for assigning non-vulgar short story); Citizens for Parental Rights v. San Mateo County Board, 51 Cal.App.3d 1, 124 Cal.Rptr. 68 (1975) (First Amendment considerations opposed to effort by parents to exclude particular material from school curriculum). See, generally, Project, Education and the Law: State Interests and Individual Rights, 74 Mich.L.Rev. 1373, 1433-42 (1976); Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1112-13 (1968)
 
 
 [4]
 A related principle is illustrated by those cases, discussed in Judge Sifton's opinion, that have invalidated laws granting public authorities broad discretion to punish speech. See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971). Judge Sifton finds this broad discretion, and the lack of precisely drawn rules for determining which books are to be permitted in the school library, sufficient to invalidate the School Board's action. In my view, this case cannot be decided on this basis. Cases such as Shuttlesworth and Eisner involved punishment imposed for certain types of speech. The vice of granting board discretion in this context is that it will have a chilling effect on all speakers; those whose speech is protected will be uncertain whether they can be punished, and will consequently hesitate to speak. In this case, however, no punishment was imposed, and there is nothing to indicate that the removal of the books carried any threat of future punishment. The connection between the action of the school and the exercise of First Amendment rights is not so direct, and the case thus requires a more detailed inquiry into the sufficiency of the threatened impact of the Board's action on the students
 
 
 [5]
 Lest it be thought that book burning is an extreme event, unlikely to follow the mere removal of a book, it is worth noting the facts presented by the plaintiffs in Zykan v. Warsaw Community School Corp., 631 F.2d 1300 (7th Cir. 1980). The books removed from a school library in that case were conveyed to a local senior citizens' group for a public burning. Id. at 1302
 
 
 [6]
 The acronym signifies Parents of New York United, according to the briefs of the parties. Board member Ahrens calls the organization People of New York United
 
 
 [7]
 In addition to the examples catalogued in Judge Sifton's opinion, mention should be made of two Board members' comments concerning the removal of A Hero Ain't Nothing But A Sandwich. In the book Nigeria Greene, a Black teacher in a predominantly Black school, calls her students' attention to the fact that George Washington was a slave owner. To the reader she expresses her thoughts about the irony of Washington's stature in the materials taught in the school. In their depositions, two Board members concluded that Ms. Greene's thoughts were anti-American and were one reason for removing the book
 
 
 [8]
 Though plaintiffs have acknowledged that defendants have not precluded discussion about the removed books or the themes of the books, I do not share Judge Mansfield's confidence that no free exchange of ideas was suppressed by the Board's action. I wonder how willing members of the school community are to discuss the virtues of Malcolm X after the School Board has condemned a book listed for disapproval because it equated Malcolm X with the founding fathers of our country. Judge Mansfield finds the evidence overwhelming that no ideas are being suppressed. I prefer to assess the sufficiency of the evidence after, not before, the trial. Furthermore, the issue at trial should not be simply whether ideas have been suppressed, but whether the action taken, in light of its motivation, posed a sufficient threat to the suppression of ideas
 
 
 [9]
 The assessment of risk to protected freedom must be made prospectively, whether or not the risk actually resulted in suppression. This is the same approach that governs when a school asserts the authority to regulate student activity; school authorities must demonstrate facts that might reasonably have led them "to forecast substantial disruption of or material interference with school activities." Tinker v. Des Moines Independent School District, supra, 393 U.S. at 514, 89 S.Ct. at 740. The need for a prospective assessment is especially important in evaluating the risk to First Amendment freedoms. If the removal of books, under the circumstances in which it occurred, dissuaded some members of the school community from expressing views because of the message they derived from the Board's action, they may be reluctant publicly to acknowledge that they hold such views and thereby risk the Board's displeasure